507 A.2d 1274

Duquesne Light Company and Pennsylvania Power Company, Petitioners *v.* Pennsylvania Public Utility Commission, Respondent.

Argued February 5, 1986, before President Judge CRUMLISH, JR. and Judges ROGERS, CRAIG, DOYLE, BARRY, COLINS and PALLADINO.

*Eric P. Reif,* with him, *W. Thomas McGough, Jr.; Reed, Smith, Shaw & McClay,* and *Charles E. Thomas* and *Patricia Armstrong, Thomas and Thomas,* for petitioners.

*Lee E. Morrison,* Assistant Counsel, with him, *Robert F. Frazier,* Assistant Counsel, *Daniel P. Delaney,* Deputy Chief Counsel, and *Charles F. Hoffman,* Chief Counsel, for respondent.

*Daniel Clearfield,* Assistant Consumer Advocate, with him, *Kathleen Cook,* Legal Assistant, and *David M. Barasch,* Consumer Advocate, for intervenor, Office of Consumer Advocate.

OPINION BY JUDGE ROGERS, April 16, 1986:

Duquesne Light Company and Pennsylvania Power Company (Companies) seek review of two orders of the Pennsylvania Public Utility Commission (Commission). The first order, dated September 11, 1984, adopted in part and modified in part a Stipulation Agreement entered into by the Companies and the Commission Trial Staff which established a market price capping mechanism by which the Companies could recover the cost of coal purchased from certain mines known as the Quarto mines. The second order, dated December 10, 1984, provided amplification of the Commission's previous order.

The Companies are members of the Central Area Power Coordination Group (CAPCO). In 1969 and

1971, CAPCO entered into agreements with the Quarto Mining Company for the development of three underground coal mines. CAPCO's purpose was to secure a long-term source of coal.

In December, 1980, the Commission instituted an investigation into the reasonableness of the costs of coal purchased from the Quarto mines incurred by the Companies, and thereupon recovered through their energy adjustment clauses. In its December 11, 1980 opinion and order, the Commission stated:

> Upon a review of current reports from Duquesne and Penn Power concerning Quarto coal and the utilities' energy adjustment clause, the Commission has reason to believe that the cost of Quarto coal being recovered through the utilities' energy adjustment clause may be excessive and unreasonable.

The Commission thereafter entered an interim order establishing a cap for the purpose of pricing Quarto coal in the Companies' net energy clauses.

In September, 1982, the Trial Staff and the Companies entered into a Stipulation Agreement which established a new Quarto mine price cap formula for adjusting the market price per ton of coal. The market price agreed to was based on determinations made by Julian Tobey, the Companies' coal market expert, of Tobey S. Associates, a fuel and energy consulting firm, and was to be escalated and deescalated using a methodology employed by the John T. Boyd Company, a mining and geological engineering consulting firm. The Stipulation Agreement also provided that the Companies could charge customers the Quarto market price for all coal purchased for use at their Mansfield Plant, whether or not the coal was actually purchased from the Quarto mines. The difference between the Companies' actual cost of such coal and the cost calculated pursuant

to the new Quarto formula was to be used to reduce previously deferred Quarto mine costs. An Administrative Law Judge (ALJ) approved the Stipulation Agreement and adopted it as his initial decision, subject to Commission approval. The ALJ wrote that the terms of the Stipulation Agreement "for the purposes of calculation of their respective energy cost rates provide for a fair and reasonable resolution of the investigation concerning the reasonableness of the cost of such coal."

In October, 1982, the Office of Consumer Advocate (OCA) filed a notice of intervention with the Commission expressing concern that the Stipulation Agreement approved by the ALJ did not adequately protect ratepayers from being charged unjust and unreasonable costs for coal from the Quarto mines. After public hearings, the Commission remanded the matter to the ALJ for a determination whether the Commission should or should not make a final determination of the reasonableness of the deferred Quarto mine costs, whether the Stipulation Agreement was in the public interest, whether the Tobey/Boyd methodology adopted in the Stipulation Agreement should be changed, and whether the settlement would produce rates which would be fair, just, reasonable, and lawful.

At hearings before the ALJ, the Commission's Trial Staff presented the testimony of John Dial, Director of the Commission's Bureau of Audits, and Dennis Dougherty, a staff member in that Bureau, concerning the appropriate price cap formula to be applied after 1984. At the conclusion of the hearings, the ALJ once again approved the Stipulation Agreement and concluded (1) that the Companies were not imprudent in initiating and continuing the Quarto project, and (2) that the Stipulation Agreement was in the public interest and would produce rates which were fair, just, reasonable, and lawful. The OCA and Trial Staff filed excep-

tions to the decision; all exceptions were overruled. The OCA and Trial Staff appealed to the Commission.

In an order dated September 11, 1984, the Commission affirmed and adopted the ALJ's finding that the Companies were not imprudent in initiating or continuing the Quarto mine project. However, it ordered modification of the Stipulation Agreement as pertaining to the pricing of Quarto coal after January 1, 1984 by adopting the Dial/Dougherty pricing methodology proposed by Trial Staff at the hearings, in substitution of the Tobey/Boyd formula espoused by the Companies. The Commission found that the Dial/Dougherty methodology as applied in the calculation of the market price cap was more representative of the type of deep-mined coal delivered in the region of the Mansfield Plant, where all Quarto coal bought by the Companies was used. Specifically, low-sulfur coal, coal with a sulfur content below 1%, was eliminated from the formula because the Quarto mines did not produce low-sulfur coal and also because the Mansfield Plant is equipped to burn high-sulfur coal. In addition, the coal delivered by three generating stations used in the market sample which were quite distant from the Mansfield Plant was removed from the analysis and replaced by coal from a closer station. The modifications in effect decreased the market price per ton of coal by $8.18.

The Companies filed a petition for clarification, reconsideration, stay and re-hearing, arguing that the Commission had illegally and inappropriately altered the Stipulation Agreement. In an order dated December 10, 1984, the Commission provided amplification of its prior order, "given the importance of a proper understanding by the parties," but otherwise reaffirmed it. The Commission stated:

The Companies have misconstrued the intent of the Stipulation and the September 11,

1984 Opinion and Order in this investigation. The intent of the Stipulation was to establish a mechanism whereby the Companies would have an opportunity to recover the deferred Quarto costs, not to 'accomplish a recovery of the Quarto deferred costs.' The modified form of the original Stipulation, as set forth in the September 11, 1984 Opinion and Order, allows the Companies an *opportunity* to recover the deferred Quarto costs.

....

Notwithstanding our succinct pronouncement, the Companies, through their Petition, continuously assume that the original Stipulation has legal force and created inalienable rights between the Trial Staff and the Companies. As we stated in our Opinion and Order, the Commission is not bound by any of the terms of the Agreement nor are we prohibited from reasonably modifying said agreement. (Emphasis in the original, footnotes omitted.)

The Companies' petition for review of these orders is now before us.

The Companies first claim that the Commission erred as a matter of law by substituting the Dial/Dougherty pricing methodology for the Tobey/Boyd methodology set forth in the Stipulation Agreement and thereby denying them the right to recover deferred Quarto costs, in the absence of a finding that the Companies were imprudent in initiating and continuing the Quarto project, or that they abused managerial discretion in incurring any costs for Quarto coal.

It is a fundamental principle of public utility law that a utility may not recover costs from its ratepayers unless such costs have been determined to be just and reasonable. Section 1301 of the Public Utility Code, 66

Pa. C. S. §1301. The Commission has an ongoing duty to protect the public from unreasonable rates while assuring that public utility companies are permitted to charge rates sufficient to cover their costs and provide a reasonable rate of return. *Commonwealth v. Duquesne Light Company,* 469 Pa. 415, 366 A.2d 242 (1976). Recovery of costs which are found to be the result of managerial imprudence may properly be denied. *See UGI Corp. v. Pennsylvania Public Utility Commission,* 49 Pa. Commonwealth Ct. 69, 410 A.2d 923 (1980). However, it does not necessarily follow that recovery of costs prudently incurred will always be allowed. *See Philadelphia Electric Company v. Pennsylvania Public Utility Commission,* 61 Pa. Commonwealth Ct. 325, 433 A.2d 620 (1981). The Commission on many occasions has disallowed recovery of costs even though there was no finding that the utility in question had imprudently incurred the costs. *Bell Telephone Company of Pennsylvania v. Pennsylvania Public Utility Commission,* 83 Pa. Commonwealth Ct. 331, 478 A.2d 921 (1984) (information systems development costs); *Peoples Natural Gas Company v. Pennsylvania Public Utility Commission,* 47 Pa. Commonwealth Ct. 512, 409 A.2d 446 (1979) (rate case and computer service expenses); *Butler Township Water Company v. Pennsylvania Public Utility Commission,* 81 Pa. Commonwealth Ct. 40, 473 A.2d 219 (1984) (rate case expenses). Nevertheless, the Companies urge that since the Commission affirmed the ALJ's finding that the Companies were not imprudent in initiating and continuing the Quarto project, the Commission had no right to interfere with lawful management. decisions by denying the Companies the right to recover Quarto coal costs.

While it is true that the Commission's authority to inject itself in the internal management of a public utility is limited, the Commission may regulate utilities

where their actions affect the public they serve. Of course, rates affect that public. Indeed the Commission has an ongoing duty to protect the public from unreasonable rates. *Metropolitan Edison Company v. Pennsylvania Public Utility Commission,* 62 Pa. Commonwealth Ct. 460, 437 A.2d 76 (1981). Prudence on the part of a utility in incurring certain expenses is no guarantee that it will recover those expenses dollar for dollar from its customers. Utility rates must be just and reasonable when charged, a standard temporarily and therefore often actually quite removed from the prudence of the original arrangements for the products needed to supply the services for which the rates are later charged.

The Companies claim that the present case is controlled by our decision in *National Fuel Gas Distribution Corp. v. Pennsylvania Public Utility Commission, (NFG),* 76 Pa. Commonwealth Ct. 102, 464 A.2d 546 (1983). The Companies contend that *NFG* stands for the proposition that unless an operating expense is declared to be imprudent or the product of an abuse of discretion it must be included in the utility's rate base. We disagree.

In *NFG* we upheld the Commission decision disallowing the recovery of synthetic natural gas expenses as unreasonable. We disagreed with the Commission's finding of managerial abuse by the utility. The Companies here apparently base their interpretation of *NFG* on a portion of the Commission's decision ordering a refund based on a conclusion of managerial abuse. We reversed this aspect of the order and remanded the record on the ground that there was no finding that the rates were unlawful or unreasonable as required by Section 1312 of the Public Utility Code concerning refunds. *NFG* clearly does not stand for the proposition that the utility must be permitted to recover its claimed ex-

penses if there is no finding of an abuse of discretion. Indeed in *NFG* we upheld a denial of the recovery of expenses in the face of an express determination that the evidence did not support a finding of abuse of discretion.

The Companies next claim that the Commission cannot impose a methodology for determining the market price per ton of coal as a proper expense where there has been no agreement to that price by the Companies.

The Stipulation Agreement entered into by the Companies and Trial Staff established a base prevailing market price as of January 1, 1981. The agreement provided that as of January 1, 1984, a new price was to be established using either the Tobey/Boyd pricing methodology or some other equivalent methodology. The methodology to be used was to be agreed upon by the parties before January 1, 1984 to become effective. The Commisssion substantially adopted the Stipulation Agreement, but felt that the agreement "beg[ged] the question of the appropriate pricing methodology to be used, after January 1, 1984, to effectuate the philosophy of the Stipulation Agreement." The Commission noted that the parties agreed that the agreement left that matter unresolved. The Commission then proceeded to modify certain aspects of the Tobey/Boyd methodology, as will be more fully discussed below.

The Companies in effect are arguing that the Commission, by modifying the agreed upon pricing methodology, improperly exercised its duty to protect the public from unjust and unreasonable rates. We note that the Stipulation Agreement by its very terms contemplated use of "either the Tobey/Boyd pricing methodology or some other equivalent methodology." The Commission found that implicit in that language was the result that absent such agreement, the Commission

would ultimately have to determine an appropriate pricing methodology.

The Commission never adopted the Stipulation Agreement, as the Companies suggest in their brief. Just as a utility cannot, by entering into unsupervised contracts with third parties, deprive the Commission of its power to rule on the reasonableness of a utility's rates *(National Fuel Gas Distribution Corp. v. Pennsylvania Public Utility Commission,* 76 Pa. Commonwealth Ct. 102, 464 A.2d 546 (1983)), it cannot bind the Commission by an agreement entered into with Trial Staff. *Glenside Suburban Radio Cab, Inc. v. Pennsylvania Public Utility Commission,* 49 Pa. Commonwealth Ct. 523, 411 A.2d 874 (1980).

The Companies' next argument attacked the merits of the Dial/Dougherty methodology adopted by the Commission. The Companies claim that the Dial/Dougherty methodology was improperly imposed because its impact on the Companies was never studied and because it fails to replicate the Mansfield Plant's prospective coal sources.

In its discussion, the Commission wrote:

> Having carefully evaluated the evidence offered by Duquesne, Penn Power, the OCA and Trial Staff, it is our opinion, and we so find, that a market definition replicating the Quarto project should serve as the basis for pricing coal delivered to the Mansfield Generating Station. We also find the Tobey pricing methodology for determining a prevailing market price, which would then be adjusted by the Boyd pricing methodology, and brought back 'into true' with the market price at least once every two years, to be reasonable, subject to our concurrence with Trial Staff's argument and proposal that two general changes to the Tobey-Boyd pricing method-

ology are appropriate: elimination of low-sulfur coal from the market and a change in generating stations used in the market sample.

We find the elimination of low-sulfur coal, that is, coal with sulfur content below 1%, from the market sample to be appropriate since the Mansfield facility is equipped with scrubbers and can burn high-sulfur coal. Moreover, Quarto does not produce low-sulfur coal, so such coal in not 'similar' to Quarto coal. We also find Trial Staff's proposal to remove the three generating plants in extreme southern Ohio, included by Mr. Tobey, and to add the Fort Martin generating plant, excluded by Mr. Tobey, to be appropriate. The Fort Martin plant is very close to the Mansfield facility while the Gavin, Kyger Creek and Stewart plants are much further away. In *sum*, we find the proposal of Trial Staff to be reasonable and, as such, it is adopted as a modification to the Tobey-Boyd pricing methodology as of January 1, 1984.

The modifications of the Stipulation Agreement were made pursuant to findings of fact by the Commission based on evidence adduced at the public hearings concerning this matter. This court is empowered to overturn factual findings of an expert administrative agency only when such findings are not supported by substantial evidence. *Norfolk and Western Railway Co. v. Pennsylvania Public Utility Commission,* 489 Pa. 109, 413 A.2d 1037 (1980).

The Commission eliminated the price of low-sulfur coal from the analysis described in the Stipulation Agreement. The Companies really offer no reason why low-sulfur coal should not have been eliminated. The Commission noted that the Mansfield Plant is equipped with scrubbers to burn high-sulfur coal. Mr. Dial testi-

fied that low-sulfur coal is clearly a different product from high-sulfur coal. He stated that low-sulfur coal is sold at a premium price in the market and would not be purchased for a power plant with scrubbers. The Commission reasoned that to include the more expensive low-sulfur coal in the pricing methodology would twice burden the ratepayer, who has already paid the cost of installing scrubbers, for the cost of controlling sulfur emissions. The elimination of the low-sulfur coal is supported by the evidence on the record.

The Commission also removed three distant generating plants from the analysis and included one nearer to the Mansfield Plant. Mr. Dial testified that the three distant plants were "simply too far away" from the Mansfield Plant. Mr. Tobey, the Companies' witness, testified that "there is some logic to this elimination, since the three stations in the southernmost part of the area that purchase deep-mined coal under contracts (Gavin, Kyger Creek and Stewart) are located at considerably greater distances from the Mansfield station than are the stations in the area."

The Companies' final claim is that the Stipulation Agreement gave them a legal right to recover all deferred Quarto costs. Unfortunately, the Stipulation Agreement does not so provide. The agreement sought to provide an opportunity to collect costs. The Stipulation Agreement as modified by the Commission pursuant to its authority provides ample opportunity for the Companies to collect deferred Quarto costs. The average base market price calculated using the Dial/Dougherty methodology applies to all coal purchased by the Mansfield Plant, including non-Quarto coal which comprises approximately 60% of the coal delivered to Mansfield and is 59-100% cheaper than Quarto coal. It is therefore evident that as the Companies purchase greater amounts of cheaper non-Quarto coal they

will recover increased amounts of deferred Quarto costs.

The questions advanced by the Companies concern only matters which are within the regulatory powers of the Commission, whose findings are firmly supported by the record. The Companies' position seems to be that because they prudently developed Quarto in the first place they must recover their deferred costs of the project from the ratepayers at Quarto prices, although the Quarto prices are higher than for local coal. The Commission's action of modifying a prehearing stipulation so that the price allowed the Companies is lower than Quarto's current price *but higher than those for local coal*, with the effect of allowing recovery of some deferred costs is clearly reasonable. Moreover, there is no evidence whatsoever that the effect of the Commission's orders will be to confiscate the Companies' property or deny them a fair return upon the properties devoted to the public service.

Orders affirmed.

### ORDER

AND NOW, this 16th day of April, 1986, the orders of the Pennsylvania Public Utility Commission in the above-captioned matter are affirmed.