526 A.2d 823

Equitable Gas Company, Petitioner *v.* Pennsylvania Public Utility Commission, Respondent.

Argued September 10, 1986, before President Judge CRUMLISH, JR., and Judges CRAIG, MACPHAIL, DOYLE, BARRY, COLINS and PALLADINO.

*Charles E. Thomas, Jr.,* with him, *Thomas T. Niesen, Lawrence B. Nydes* and *Amy M. A. Klodowski, Thomas & Thomas;* Of Counsel: *William A. Mogel,* with him, *William R. Mapes, Jr.,* and *Randall C. Smith, Ross, Marsh & Foster,* for petitioner.

*Alphonso Arnold, Jr.,* Assistant Counsel, with him, *John F. Povilaitis,* Deputy Chief Counsel, and *Charles F. Hoffman,* Chief Counsel, for respondent.

*Michael A. Finio,* Deputy Attorney General, Antitrust Section, with him, *Eugene F. Waye,* Deputy Attorney General, Chief, Antitrust Section, and *LeRoy S. Zimmerman,* Attorney General, for Intervenor, Office of Attorney General.

*Robert P. Haynes, III,* Assistant Consumer Advocate, with him, *H. Kay Dailey* and *Craig R. Burgraff,* Assistant Consumer Advocates, and *David M. Barasch,* Consumer Advocate, for Intervenor, Office of Consumer Advocate.

*David Kleppinger, McNees, Wallace and Nurick,* for Intervenor, Equitable Industrial.

OPINION BY JUDGE PALLADINO, May 20, 1987:

Equitable Gas Company (Equitable) petitions for review of an order of the Pennsylvania Public Utility Commission (PUC) which adopted, with modification, the recommended decision of an Administrative Law Judge (ALJ) which found Equitable's Computation of Annual Purchased Gas Adjustment to be unjust and unreasonable.

On March 1, 1985, Equitable filed a Computation of Annual Purchased Gas Adjustment (Section 1307(f) Filing) with the PUC pursuant to Section 1307(f) of the

Public Utility Code (Code).[1] The Section 1307(f) Filing proposed increases in rates effective September 1, 1985 which reflected Equitable's projected natural gas costs for twelve months ending August 31, 1986. In addition,

---

[1] Added by Act of May 31, 1984, P.L. 370, 66 Pa. C. S. §1307(f). This Section provides in pertinent part:

(f) Recovery of natural gas costs.—

(1) natural gas distributors with gross intrastate annual operating revenues in excess of $40,000,000 may file tariffs reflecting increases or decreases in their natural gas costs and the tariffs shall have an effective date six months from the date of filing. The commission shall promulgate regulations establishing the time and manner of such filing, but no such natural gas utility shall voluntarily file more than one such tariff in a 12-month period: Provided, That nothing contained herein shall prohibit any party from advising the commission that there has been or there is anticipated to be a significant difference between the natural gas costs to the utility and the costs reflected in the then effective tariff or the commission from acting upon such advice.

(2) The commission shall hold a hearing or hearings, with notice, to investigate the tariffs. Where there has been an indication of consumer interest, the hearing shall be held in the service territory of the natural gas distributor. Prior to the effective date of the filing, the commission shall issue an order establishing the rate to be charged to reflect such increases or decreases in natural gas costs. Rates established under this subsection do not constitute either a sliding scale of rates or an automatic adjustment subject to the prohibitions in subsections (a) and (b). Such rates, however, are subject to the same kinds of audits, reports and proceedings required by subsection (d).

(3) Within 60 days following the end of such 12-month period as the commission shall designate, each public utility subject to this subsection shall file with the commission a statement which specifies for such period:

(i) The total revenues received pursuant to this section.

(ii) The total gas expense incurred.

(iii) The difference between the amounts specified by subparagraphs (i) and (ii).

(iv) Evidence explaining how actual costs incurred differ from the costs allowed under paragraph (2) and why such differences occurred.

pursuant to 52 Pa. Code §53.64, Equitable included a reconciliation plan for the treatment of $14.3 million in alleged undercollected natural gas costs. On March 11, 1985, the PUC instituted an investigation to determine the lawfulness, justness and reasonableness of the proposed rates in Equitable's Section 1307(f) Filing. A Complaint against the Section 1307(f) Filing was filed by the Office of Consumer Advocate (OCA). The

---

(v) How these costs are consistent with a least cost procurement policy as required by section 1318 (relating to determination of just and reasonable natural gas rates). Such report shall be a matter of public record and copies thereof shall be made available by the gas distributor to any person upon request. Copies of the reports shall be filed with the Office of Consumer Advocate at the same time as they are filed with the commission.

(4) The commission shall hold a public hearing on the substance of such statement submitted by a utility as required in paragraph (3) and on any related matters.

(5) The commission after hearing, shall determine the portion of the companies' actual gas costs in the previous 12-month period which meet the standards set out in section 1318. The commission shall, by order, direct each gas utility subject to this subsection to refund to its patrons any gas revenues collected pursuant to paragraph (2) which exceed the amount of actual gas expenses incurred consistent with the standards in section 1318 and to recover from its patrons any amount by which the actual gas expenses, which have been incurred consistent with the standards in section 1318, exceed the revenues collected pursuant to paragraph (2). Absent good reason to the contrary, the commission shall issue its order within six months following the filing of the statement described in paragraph (3). Refunds to patrons shall be made with interest, which shall be the average rate of interest specified for residential mortgage lending by the Secretary of Banking in accordance with the act of January 30, 1974 (P.L. 13, No. 6), referred to as the Loan Interest and Protection Law, during the period or periods for which the commission orders refunds: Provided, That nothing contained herein shall limit the applicability of any defenses, principles or doctrines which would prohibit the commission's inquiry into any matters that were decided finally in the commission's order issued under paragraph (2).

complaints were consolidated with the PUC's investigation. On March 15, 1985, at a pre-hearing conference, the investigation was consolidated with the PUC's investigation into Supplement No. 50 to Tariff Gas—Pa. P.U.C. No. 20 filed by Equitable on January 4, 1985 to increase base rate revenues by approximately $36,273,000. Throughout April and May of 1985, thirteen evidentiary hearings were held and a consolidated Public Input Hearing was held on May 2, 1985. On June 26, 1985, the ALJ issued his Recommended Decision finding Equitable's Section 1307(f) Filing unjust and unreasonable. Exceptions and Reply Exceptions to the Recommended Decision were filed by Equitable, OCA and by the PUC Trial Staff (Trial Staff) before the full PUC. The Recommended Decision was adopted, in material part, by the PUC in its order on August 29, 1985.

Equitable petitioned for review to this court challenging 1) the constitutionality of Act 74[2] and 2) the PUC's order. In addition, Equitable and Kentucky West Virginia Gas Company instituted a complaint in the United States District Court for the Middle District of Pennsylvania seeking injunctive and declaratory relief against enforcement of the Order and Act 74. By order entered November 6, 1985, the complaint was dismissed by the district court on the basis of the abstention doctrine.[3] This order was appealed to The United States Court of Appeals for The Third Circuit which reversed the district court's order and remanded the

---

[2] Sections 1307(f), 1317, 1318, and 1319 of The Public Utility Code were added effective July 30, 1984 by Act 74 of 1984 (Act 74), 66 Pa. C. S. §§1307(f), 1317, 1318, 1319.

[3] *Kentucky West Virginia Gas Company v. Pennsylvania Public Utility Commission*, 620 F. Supp. 1458 (M.D. Pa. 1985).

case for disposition on the merits.[4] On remand, the district court upheld the constitutionality of Act 74 and held that it was not violative of the Commerce Clause,[5] the Supremacy Clause,[6] the first, fifth and fourteenth amendments,[7] the Natural Gas Act, 15 U.S.C. §717 *et seq.* and the Natural Gas Policy Act, 15 U.S.C. §330 *et seq.*[8]

As the challenge to the constitutionality of Act 74 has been addressed by the District Court, we will limit[9]

---

[4] *Kentucky West Virginia Gas Company v. Pennsylvania Public Utility Commission,* 791 F.2d 1111 (3d Cir. 1986).

[5] The Commerce Clause empowers Congress to "Regulate commerce with foreign nations, and among the several states, and with the Indian Tribes." U.S. Const. art. I, §8, cl. 3.

[6] The Supremacy Clause provides in pertinent part: "This Constitution, and The Laws of the United States which shall be made in pursuance thereof . . . shall be the supreme law of the land, . . . ." United States Const. art. VI, cl. 2.

[7] United States Const. amend. I, V, and XIV, §1.

[8] Equitable requested a permanent injunction against the PUC to prohibit it from inquiring into Equitable's choice of natural gas from among competing gas suppliers. This request was based upon the approval by the Federal Energy Regulatory Commission (FERC) of Kentucky West's gas rates as just and reasonable for the purposes of federal law.

We note Equitable also appealed that portion of the PUC order which directed Equitable to retain separate counsel and support staffs from those of Kentucky West in future appearances before the FERC. Equitable alleged that this action violated their First Amendment right of association and to petition the government for redress of grievances as well as denied their due process. The District Court declined to dispose of this issue "because the PUC may bring it to the attention of FERC for whatever disposition FERC feels is appropriate if, and when, plaintiffs disregard the PUC's directive."

[9] Although this Court is not bound by the District Court's analysis upholding the constitutionality of Act 74 in *Kentucky West Virginia Gas Company v. Pennsylvania Public Utility Commission,* 650 F. Supp. 659 (M.D. Pa. 1986), we are persuaded by the analysis of the District Court and agree with the District Court's disposition of the constitutional challenge.

our review to the question of whether the PUC's order is supported by substantial evidence and in conformity with the law.[10]

## BACKGROUND

Equitable is the regulated utility division of Equitable Resources, Inc. Equitable is engaged in the production, purchase, storage, transportation, transmission, distribution and sale of natural gas. Equitable's principal service areas are the greater Pittsburgh area and other portions of Southwestern Pennsylvania.

Equitable's gas supply is composed of (1) company produced gas from wells located in Pennsylvania and West Virginia; (2) gas purchased from local producers in Pennsylvania and West Virginia; and (3) gas purchased from three Federal Energy Regulatory Commission (FERC) regulated interstate pipeline suppliers: Kentucky West Virginia Gas Company (Kentucky West), Texas Eastern Transmission Corporation (TETCO) and Tennessee Gas Pipeline Company (Tennessee). Kentucky West is a wholly-owned subsidiary of Equitable Resources, Inc.

Prior to the enactment of Act 74 gas utilities in Pennsylvania were permitted to recover the cost of gas acquired to supply retail demand through a proceeding known as a Gas Cost Rate (GCR) proceeding.

The Gas Cost Rate mechanism for the automatic adjustment of gas cost charges is authorized by Code Section 1307, 66 Pa. C. S. §1307 entitled 'Sliding scale of rates; adjustments' and by the

---

[10] Our scope of review is limited to a determination of whether constitutional rights have been violated, an error of law committed or whether the findings, determinations or order of the Commission are supported by substantial evidence. *Pennsylvania Power and Light Company v. Pennsylvania Public Utility Commission,* 101 Pa. Commonwealth Ct. 370, 516 A.2d 426 (1986).

Commission's Order of May 21, 1978, Docket No. M-78050055, reported at 52 Pa. P.U.C. 217-220. Such mechanisms are common and are denominated variously 'fuel adjustment clauses,' 'purchased gas adjustment clauses,' 'escalator clauses,' and 'pass-through procedures.' With differences in the details of operation, each mechanism allows the regulated gas utility to reflect in customer charges changes in the price paid by the utility for the gas it distributes without the necessity of preparation or approval of a revised tariff. That is, these mechanisms by means of a formula like the one set forth at 52 Pa. P.U.C. page 219, pass through to customers changes in the utility's cost of gas. The constitutional validity of a similar automatic adjustment mechanism, the Energy Cost Rate applicable to electric utilities, was recently upheld in Allegheny Ludlum Steel Corporation v. Pennsylvania Public Utility Commission, 501 Pa. 71, 459 A.2d 1218 (1983).

The GCR here at issue is a 'levelized' adjustment mechanism which means that the cost of gas passed through to the customer remains constant for a specified period—here one year—with an opportunity during subsequent annual periods for the utility to reconcile past over-collections or under-collections by charging increased or decreased rates to the extent that its predictions as to the cost of its purchased gas fell short of or were greater than the utility's actual experience [, i.e. Reconciliation.]

*National Fuel Gas Distribution Corporation v. Pennsylvania Public Utility Commission,* 76 Pa. Commonwealth Ct. 102, 113 n. 6, 464 A.2d 546, 552 n. 6 (1983) *(NFG 1).* The relevant period of inquiry for over/under collec-

tions would be the June preceding the September implementation date of the new rate.

In 1984, the Pennsylvania Legislature implemented amendments to the Code commonly referred to as Act 74.[11] These amendments put into place a new mechanism for the recovery of natural gas costs.

Section 1307 of the Code provides for automatic adjustment of a utility's rates to reflect changes in fuel costs. Specifically, Section 1307(f)(1) allows a natural gas distributor with gross intrastate annual operating revenues in excess of $40,000,000 to file an annual tariff reflecting increases or decreases in its natural gas cost. Before such tariffs can become effective, the PUC in accordance with Section 1318[12] must find that a utility is pursuing a least cost fuel procurement policy consistent with the utility's obligation to provide safe, adequate, and reliable service.

At issue in the case at bar is Equitable's first Section 1307(f) Filing under the procedures established by Act 74 and PUC regulations.[13] The Section 1307(f) Filing proposed an increase in rates effective September 1, 1985 reflecting 1) Equitable's projected natural gas costs from September 1, 1985 through the twelve months ending August 31, 1986, and 2) a reconciliation plan for the treatment of over/under collections during the transition period from the current gas cost rate mechanism (GCR) to the Section 1307(f) Filing procedure. The reconciliation plan was pursuant to PUC regulations which state in pertinent part:

(2) During the period of transition from the current gas cost rate mechanism to the procedure under 66 Pa. C. S. §1307(f) . . . utilities shall file a reconciliation plan subject to commis-

---

[11] See footnote 2 above.
[12] 66 Pa. C. S. §1318.
[13] 52 Pa. Code §53.64.

sion approval for the treatment of over/under collections during the period. The plan shall be filed concurrently with the utility's tariff under 66 Pa. C. S. §1307(f) and must include a minimum of 6 months actual over/under collection data.

52 Pa. Code §53.64(h)(2). The reconciliation plan provided for a recovery, through a rate increase of $14,300,000 in undercollected gas costs for the period July, 1983 through December, 1984.

Equitable had, after an initial projection of $4.05030 per MCF,[14] proposed a gas cost rate of $3.9704 per MCF. The PUC rejected Equitable's Section 1307(f) Filing and made adjustments to Equitable's proposed gas cost expense.

The ALJ in his recommended decision proposed that Equitable be permitted a gas cost rate of $3.6084 per MCF. The PUC adopted the ALJ's recommended decision in most respects, but determined that Equitable should be permitted a gas cost rate of $3.6886 per MCF for recovery of its purchased gas expense.

The PUC's adjustments to the gas cost rate reflected their rejection of Equitable's reconciliation plan and projected gas cost purchase expense. The PUC determined that during the time period of the reconciliation plan—July, 1983 to June 30, 1984 and July, 1984 to December, 1984—Equitable had available to it, but did not use, low cost Pennsylvania and West Virginia local production and company-owned production. As a result, the PUC disallowed the pass-through of the gas costs incurred because it held that they were imprudently incurred and excessive gas costs.

---

[14] "MCF" is a unit of volumetric measure designating one thousand cubic feet. Sixty thousand MCF daily is equivalent to an annual purchase volume of approximately 18 billion cubic feet (BCF) of gas.

For the projected period of the Section 1307(f), Filing, which included the twelve months ending August 31, 1986, the PUC determined that Equitable, when it instituted a pro rata reduction of its takes from suppliers, did not consider the commodity rates charged by each supplier. Further, the PUC found that Equitable advanced no justification for its pro rata reduction which was consistent with the directive of Act 74. The purchase of higher priced gas, when lower priced gas was available, was held to be in contravention of the requirement of Act 74 that utilities pursue a least cost fuel procurement policy.

## LEGAL ISSUES

On appeal to this court, Equitable asserts that the PUC's rejection of Equitable's reconciliation plan 1) is not supported by substantial evidence, 2) is contrary to the law because the PUC had no authority to review the reasonableness of the costs incurred, and 3) is contrary to the law as it gives Act 74 an impermissible retroactive effect. Equitable also asserts that the PUC committed an error of law by improperly intruding upon Equitable's managerial discretion in rejecting their use of a pro rata purchasing strategy during the projected period of September, 1985 through August 31, 1986. In addition, Equitable asserts that the PUC applied an erroneous statutory standard to the projected supply mix for this period.

## A. Projected Natural Gas Costs—September 1, 1985 Through August 31, 1986

For the twelve-month period from September 1, 1985 through August 31, 1986, the ALJ found that Equitable projected the following company (Equitable)

production would be used in providing service to Pennsylvania jurisdictional customers as follows:

| Company Production | MMCF |
|---|---|
| Pennsylvania | 1,072 |
| West Virginia | 1,632 |

For the same twelve-month period, Equitable projected the following purchases from the following suppliers:

| Supplier | MMCF | Cost in Dollars |
|---|---|---|
| **FERC Regulated Interstate Pipeline Suppliers:** | | |
| Texas Eastern Transmission Corporation (DCQ)-C[15] | 24,625 | 86,100,000 |
| Texas Eastern Transmission Corporation (WS)[16] | 0 | 48,000 |
| Tennessee Gas Pipeline Co. | 13,935 | 59,331,000 |
| Kentucky West Virginia Gas Company | 12,938 | 51,347,000 |
| **Local Producer:** | | |
| Appalachian Supply | 6,349 | 16,774,000 |
| New Appalachian Supply | 933 | 3,507,000 |
| Cities Service | 682 | 2,325,000 |

[15] DCQ-C is a FERC approved Tariff Rate Schedule which represents rates applicable to Texas Eastern's Zone C customers. Under this contract, Equitable can purchase up to 109,207 dekatherms per day, or 39,860,555 dekatherms per year, unless Texas Eastern imposes curtailment.

[16] WS represents Winter Service. Under this contract, Equitable can purchase up to 93,420 dekatherms for the winter season at a daily maximum of 1,557 dekatherms.

For this projected period, Equitable was in a supply surplus situation. To accommodate this excess deliverability, Equitable instituted a pro rata reduction below minimum bill levels.[17] Equitable asserts that the PUC's redistribution of the projected supply mix was an impermissible intrusion upon their managerial discretion. We disagree.

Section 1307(f)(5) directs the PUC to "determine the portion of the companies' actual gas costs in the previous 12-month period which meet the standards set out in section 1318." Section 1318 mandates that "[n]o rates for a natural gas distribution utility shall be deemed just and reasonable unless the commission finds that the utility is pursuing a least cost fuel procurement policy, consistent with the utility's obligation to provide safe, adequate and reliable service to its customers."

The PUC concluded that Equitable was not implementing a least cost fuel procurement policy for this period because, among other reasons, they did not consider the commodity rates of each supplier before deciding to institute a pro rata reduction in takes. For example, at one time during the hearings, Tennessee's commodity rate was at $3.5388 per dth[18] while TETCO's rate was at $2.9932 per dth. The PUC held that projected gas takes from Tennessee be decreased from 13,8111 Mdth[19] to 7,766 Mdth and that TETCO's gas takes should be increased from 26,854 Mdth to 32,899 Mdth.

---

[17] A minimum bill level is a contractual term which requires a purchaser to take or pay for a specified amount of gas. Each of the contracts with the FERC regulated interstate pipeline suppliers and the New Appalachian Supply includes such a provision. By contrast, the contracts for local Appalachian supply are on a life of the well basis or for a period of time estimated to permit recovery of most of the reserves of the well.

[18] Dekatherm.

[19] One thousand dekatherms.

Equitable argues that the PUC's adjustment is inconsistent with its obligation to provide reliable service to its customers. Equitable believes that TETCO is the least reliable source of gas because TETCO is the supplier most likely to be in curtailment by 1995. Further, it argues, that when a gas company significantly reduces its takes from pipeline companies, the pipeline companies put these customer's long run supply at risk by petitioning the FERC to abandon their utility service obligations.

The PUC, however, explicitly rejected Equitable's arguments as too speculative and unsupported by the record. That the PUC did not accept the excuses advanced by Equitable affords no basis for appellate relief. We may not conceive an independent judgment and substitute it for the judgment of the PUC. Nor will we involve ourselves in weighing of evidence and resolution of conflicting testimony. *Metropolitan Edison Co. v. Pennsylvania Public Utility Commission*, 62 Pa. Commonwealth Ct. 460, 437 A.2d 76 (1981). Deferring, as we must to the PUC's administrative expertise and to the interpretations by that body of its governing statute and regulatory pronouncements, we reject Equitable's contention that the PUC's redistribution of their projected gas supply mix is an impermissible intrusion into the utility's managerial discretion in light of the mandate of Act 74.

In addition, Equitable contends that substantial evidence does not exist to support the PUC's conclusion. However, the record contains evidence of the disparity in commodity rates between the suppliers. Also, there were conflicting opinions as to the timeframe of future shortages and to the reliability of TETCO's gas supply in the long run. As we will not substitute our evaluation of the evidence for that of the PUC's, Equitable's assertion that substantial evidence does not exist to support the PUC's conclusion is without merit.

## B. Reconciliation Plan

Equitable's Section 1307(f) Filing also included a reconciliation plan for the recovery, through an increase in rates, of an alleged $14,300,000 in undercollected gas costs for the period July, 1983 through December, 1984. This plan was filed in accordance with 52 Pa. Code §53.64(h)(2).

The Trial Staff and OCA presented the testimony of two independent witnesses before the PUC, who concluded that during the periods July, 1983 through December, 1984, Equitable had available to it, but did not use, inexpensive company production, local Pennsylvania production and local West Virginia production. During the period of July, 1983 through June, 1984, it was asserted that 1,369,339 MCF of available company-produced gas was not taken, and in its place, more expensive gas was acquired from Equitable's affiliate, Kentucky West. As a result, the PUC adopted the proposed adjustments to the alleged undercollection by displacing the more expensive Kentucky West volumes with the less expensive company production resulting in a $5,958,829 savings to ratepayers. Equitable's claimed purchased gas costs were then reduced by that amount. Evidence was also presented which showed that relatively inexpensive gas was available from local Pennsylvania and West Virginia producers. Use of this local supply in lieu of Kentucky West's more expensive gas would have resulted in a savings of $5,898,370 to ratepayers. Accordingly, the PUC deducted this amount from Equitable's claimed purchased gas expense for the period of July, 1983 through June, 1984.

The same pattern of foregoing inexpensive local purchases and company production in favor of more expensive Kentucky West gas was alleged, by Trial Staff and OCA, as continuing through December, 1984. During the period of July, 1984 to December, 1984, it

was alleged that 1,715,966 MCF of local gas and 424,844 MCF of company production were not utilized. Use of these volumes would have resulted in a $3,199,500 savings to ratepayers. The witness opined that Equitable chose to subsidize its corporate relative, Kentucky West, at the expense of Pennsylvania ratepayers. The PUC accepted the proposed adjustments and recalculated Equitable's claimed purchase gas costs.

These adjustments resulted in significant changes in Equitable's claimed undercollection amount reflected in its Section 1307(f) Filing. The over/under collection amounts for these time periods were reviewed in the 1307(f) Filing because the alleged undercollections were used to develop the "E" factor or net undercollections which were in turn used to derive Equitable's original proposed gas cost of $4.053030 per MCF.

Equitable asserts that the PUC's rejection of the reconciliation plan is 1) unsupported by substantial evidence, 2) contrary to the law because the PUC lacks the authority to review the reasonableness of the costs incurred and 3) contrary to the law because it gives Act 74 retroactive effect.

1. Is the PUC's Order Supported by Substantial Evidence.

At the hearing before the PUC, there was testimony presented by a witness who conducted a deliverability study on the issue of the capability of company production. This witness testified as to his calculation of what levels the company could have produced and compared them with what was produced. The differential resulted in testimony as to the company production available but not used. These volumes were then used by the PUC as the basis to adjust the alleged undercollected amount.

On appeal, Equitable advances rationale for the shut-in of company production during 1983 and reduced company production during 1984. This same rationale was also advanced before the PUC but rejected. The PUC chose to accept the testimony and evidence produced by Trial Staff and OCA. The failure of the PUC to accept Equitable's justification is not a basis for appellate relief. The weighing of evidence and resolving of conflicting testimony is within the aegis of the PUC. Accordingly, we conclude that substantial evidence of record supported the PUC's order.

2. Does the PUC have the Authority to Review Actual Gas Costs.

It is an underlying principle of public utility law that a utility may not recover costs from its ratepayers unless those costs have been determined to be just and reasonable. *Duquesne Light Company v. Pennsylvania Public Utility Commission,* 96 Pa. Commonwealth Ct. 398, 507 A.2d 1274 (1986). Section 1301 provides:

> Every rate made, demanded, or received by any public utility, or by any two or more public utilities jointly, shall be just and reasonable, and in conformity with regulations or orders of the commission.

66 Pa. C. S. §1301. The PUC has an ongoing duty to protect the public from unreasonable rates while assuring that the public utility companies are allowed to recover in rates those expenses reasonably necessary to provide service to its customers and to earn a fair rate of return. *Butler Township Water Company v. Pennsylvania Public Utility Commission,* 81 Pa. Commonwealth Ct. 40, 473 A.2d 219 (1984). Recovery of costs found to be the result of managerial imprudence may properly be denied. *Duquesne Light Company.* Despite this

overall authority of the PUC, Equitable argues that the PUC had no authority to retroactively adjust Equitable's gas cost rate previously approved in GCR No. 6.[20]

As we have outlined above, the PUC has the authority to determine that costs are just and reasonable. While it is true that "Commission-made" rates cannot be retroactively changed, this doctrine is inapplicable to the case at bar. "Commission-made" rates are those rates which are implemented subsequent to an exhaustive evidentiary presentation of the utility's expenses and their *reasonableness,* the fair value of the utility's property used and useful in the public service, and the return on that value to be received by companies who are subject to similar economic risks. Numerous and lengthy public hearings are conducted, lay and expert witnesses are examined and voluminous documentary evidence is submitted. These proceedings can often span years. *National Fuel Gas Distribution Corporation v. Pennsylvania Public Utility Commission,* 81 Pa. Commonwealth Ct. 148, 473 A.2d 1109 (1984) *(NFG II).*

By contrast, the GCR rates here in issue have not been the subject of exhaustive PUC review to determine reasonableness. Consideration by the PUC, in a GCR proceeding, of proposed GCR customer charge revisions is preceded only by a brief documentary submission by the utility, analysis and a report by the PUC's staff as to compliance with GCR formula and comparison of estimated gas supply costs with the estimates of similar utilities as contained in their annual GCR filings, and a hearing at which public comment is not permitted. The GCR procedure encompasses a period of only weeks. The GCR mechanism was instituted to provide for the reflection in customer charges of

---

[20] Gas Cost Rate No. 6 for Class "A" Gas Utilities and for Eight Class "B-C-D" Gas Utilities, Commission Docket No. M-78050055F83 (Order adopted December 28, 1983).

changes in one component of a utility's cost of providing the service without the long and exhaustive review of "Commission-made" rates. Therefore, the PUC, when given the express authority to ensure that every rate "received by any public utility . . . be just and reasonable," is under a mandate to fulfill its obligation and may do so retroactively when the rates in issue were not subject to a prior review for reasonableness.

In the case at bar, Equitable could not validly expect that the costs in issue were insulated from retroactive modification because they were not stamped with antecedent PUC approval. *Metropolitan Edison.* No final determination as to reasonableness had been made by the PUC. Therefore, it was not error for the PUC to re-examine the GCR rates to determine justness and reasonableness.

Nevertheless, Equitable argues that the present case is controlled by our decision in *NFG I.* Equitable contends that *NFG I* stands for the proposition that in automatic fuel adjustment procedures Section 1307(e) authorizes refunds to ratepayers only in those instances where the utility's projections overestimate the cost of gas. Therefore, Equitable asserts that since they actually incurred $14,300,000 of undercollected gas costs during the period in question, it is entitled to recoup that amount. We disagree.

> In NFG we upheld the Commission decision disallowing the recovery of synthetic natural gas expenses as unreasonable. We disagreed with the Commission's finding of managerial abuse by the utility. The Companies here apparently base their interpretation of NFG on a portion of the Commission's decision ordering a refund based on a conclusion of managerial abuse. We reversed this aspect of the order and remanded the record on the ground that there was no find-

ing that the rates were unlawful or unreasonable as required by Section 1312[21] of the Public Utility Code concerning refunds. NFG clearly does not stand for the proposition that the utility must be permitted to recover its claimed expenses if there is no finding of an abuse of discretion. Indeed in NFG we upheld a denial of the recovery of expenses in the face of an express determination that the evidence did not support a finding of abuse of discretion.

*Duquesne Light Company*, 96 Pa. Commonwealth Ct. at 405, 507 A.2d at 1279 (1986). Furthermore, in contrast to *NFG I*, in the case at bar, the Trial Staff and OCA argued before the PUC that Equitable's gas cost rate was "unjust and unreasonable as it reflects costs that are excessive and imprudently incurred". The PUC then disallowed the pass through of the costs of Kentucky West volumes as excessive and imprudently incurred in light of the evidence presented which showed that less expensive volumes were available to Equitable.

---

[21] Section 1312 provides in pertinent part:

(a)   General rule.—If, in any proceeding involving rates, the commission shall determine that any rate received by a public utility was unjust or unreasonable, or was in violation of any regulation or order of the commission, or was in excess of the applicable rate contained in an existing and effective tariff of such public utility, the commission shall have the power and authority to make an order requiring the public utility to refund the amount of any excess paid by any patron, in consequence of such unlawful collection, within four years prior to the date of the filing of the complaint, together with interest at the legal rate from the date of each such excessive payment. In making a determination under this section, the commission need not find that the rate complained of was extortionate or oppressive. 66 Pa. C. S. §1312(a).

Equitable argues, however, that disallowing histori-cal gas cost was an impermissible intrusion upon the managerial discretion of the utility. While it is true that the PUC's authority to inject itself in the internal man-agement of a public utility is limited, the PUC may reg-ulate utilities where their actions affect the public they serve, and rates affect that public. *Duquesne Light Company.* If the utility failed to exercise reasonable managerial prudence, at that time, which amounted to an abuse of discretion in incurring costs, the PUC is empowered to intervene. Here, the PUC reviewed the evidence and concluded that the gas costs were exces-sive and imprudently incurred. That conclusion was based on testimony indicating the known availability of less expensive gas which could have been taken in lieu of more expensive gas from Equitable's affiliate, Ken-tucky West. These findings are supported by substan-tial evidence, therefore we will not substitute our judg-ment for that of the PUC. Recovery of costs found to be the result of managerial imprudence may properly be denied.

We conclude, therefore, that the PUC had the au-thority to retroactively examine the reasonableness of gas costs actually incurred. As these costs were found by the PUC to be excessive and imprudently incurred, and therefore unreasonable, the PUC could properly disallow the pass through of these costs to ratepayers.

3. Whether the PUC's rejection of the Reconcilia-tion Plan gives to Act 74 an impermissible retroactive effect.

The time period from July, 1984 to December, 1984 falls within the effective date of Act 74. We conclude that the PUC properly applied its standards to the case at bar. However, with respect to the evaluation of costs incurred by Equitable during July, 1983 to June, 1984,

we conclude that there was no retroactive application of Act 74 by the PUC because, prior to the enactment of Act 74, the PUC had the authority to retroactively determine the reasonableness of costs incurred in a subsequent proceeding. The authority to determine reasonableness was not limited to prospective application in the case at bar because the rates in issue had yet to be subject to a determination by the PUC as to their reasonableness as required by Section 1301 of the Public Utility Code.

## CONCLUSION

Finding that substantial evidence supports the Order of the PUC and that no error of law was committed, the Order of the PUC is affirmed.

### ORDER

AND NOW, May 20, 1987, the order of the Public Utility Commission in the above-captioned case is affirmed.