561 A.2d 43

**PENNSYLVANIA POWER COMPANY, Petitioner,**

**v.**

**PENNSYLVANIA PUBLIC UTILITY
COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued March 8, 1989.

Decided June 16, 1989.

As Amended June 30, 1989.

Petition for Allowance of Appeal Granted Nov. 15, 1989.

98

Alan L. Reed, Thomas P. Gadsden, Paul R. Bonney, Morgan, Lewis & Bockius, (James R. Edgerly, Vice President, Secretary and Gen. Counsel, Stephen L. Feld of Pennsylvania Power Co., of counsel), Philadelphia, for petitioner.

Kevin J. Moody, Asst. Counsel, Bohdan R. Pankiw, Deputy Chief Counsel and John G. Alford, Acting Chief Counsel, Harrisburg, for Pennsylvania Public Utility Com'n.

Scott J. Rubin, Asst. Consumer Advocate, Harrisburg, for intervenor, David M. Barasch, Consumer Advocate.

Before CRUMLISH, Jr., President Judge, and CRAIG, DOYLE, COLINS, PALLADINO, McGINLEY and SMITH, JJ.

CRAIG, Judge.

Pennsylvania Power Company (Penn Power or company) appeals from a decision of the Pennsylvania Public Utility Commission (PUC or commission) that refused to allow the company, under the energy cost rate (ECR) mechanism,[1] to include in its rates certain expenses incurred by the company as the result of a sale and buyback agreement with another utility. Penn Power raises issues of whether the commission's order is consistent with its subsidiary find-

---

1. The ECR mechanism is provided by section 1307 of the Public Utility Code, 66 Pa.C.S. § 1307. The Pennsylvania Supreme Court explained the purpose of the ECR in the case of *Allegheny Ludlum Steel Corp. v. Pennsylvania Public Utility Commission*, 501 Pa. 71, 75–76 n. 3, 459 A.2d 1218, 1220 n. 3 (1983):

 The purpose of the ECR is to provide an automatic mechanism enabling utilities to recover specific *energy costs* not covered by general rates, by allowing collection of rates based on projected cost data for the calendar year.... The ECR determines, therefore, the amount per kilowatt hour which the customer pays in addition to the base rate. Undercollections and overcollections of realized energy costs are reconciled annually. (Emphasis added.)

ings, whether such action by the commission is pre-empted by federal law, and whether the order effects an unconstitutional taking of the company's property.

## *History*

Penn Power is a regulated Pennsylvania public utility that is a wholly-owned subsidiary of Ohio Edison Company (Ohio Edison). In 1967, in response to predictions of increased demand for electricity, Penn Power joined with four other utilities to form the Central Area Power Coordinating Group (CAPCO),[2] for the purpose of constructing additional capacity. CAPCO originally planned to build seven large nuclear generating units. Later events, principally the oil embargo of the early 1970's and the nuclear accident at Three Mile Island, radically changed the outlook both for the growth of demand for electricity and for the use of nuclear power as a means of meeting that demand. In 1980 CAPCO decided to cancel plans for construction of four of the nuclear units. Penn Power asserts that, as part of the overall 1980 cancellation agreement, Cleveland Electric agreed to acquire 12 megawatts (Mw) of Penn Power's original 75 Mw share of Perry Unit No. 1, but in return for its agreeing to purchase that share, Cleveland Electric required Penn Power to buy back the power from that 12 Mw for a period of eighteen months, beginning on the date that Perry 1 achieved commercial operation. Costs of the buyback were to be determined in accordance with the terms and conditions set forth in the CAPCO Basic Operating Agreement on file with the Federal Energy Regulatory Commission (FERC). Perry 1 became operational on November 17, 1987.

On November 16, 1987, Penn Power filed with the PUC an interim energy cost rate to become effective December 1, 1987. Penn Power's interim ECR filing proposed to increase its energy cost rate from 1.741 to 6.768 mills per

2. The other utilities are Ohio Edison, Duquesne Light Company, Cleveland Electric Illuminating Company (Cleveland Electric) and Toledo Edison Company.

kilowatt hour (Kwh), attributing the need for such an increase in part to the costs associated with the 12 Mw Perry 1 buyback. The company's ECR filing projected the Perry 1 buyback costs to be approximately $1 million per month,[3] or $18 million total over the eighteen-month period of the buyback agreement, although a current market value for the same amount of power from other sources is only about $100,000 per month, or $1.8 million total.

The commission issued an order that initiated an investigation into the reasonableness of the interim ECR filing, accepted the company's proposal to synchronize its next ECR with the new rates to be set in Penn Power's base rate proceeding then pending before the commission, and permitted Penn Power to increase its ECR to 3.579 mills/Kwh temporarily. The temporary ECR increase did not include any allowance of recovery of costs of the Perry 1 buyback. The investigation into the ECR filing was assigned to Administrative Law Judge Michael A. Nemec (ALJ), who was also presiding over Penn Power's concurrent but separate base rate proceeding. The parties to both proceedings were the commission's Office of Trial Staff (OTS), the Office of Consumer Advocate (OCA) and the company.

The ALJ decided that allowing Penn Power to recover all of the costs of the Perry 1 buyback through the mechanism of the ECR would be unreasonable and hence unlawful. The ALJ stated that, because of his approval of the company's proposal to treat the buyback costs through the ECR, the proper evaluation of the claimed costs involved "look[ing] at the transaction in terms of the reasonableness of the purchase at the present time." Supplemental Recommended Decision 23.

The ALJ declined to hold, as urged by OTS and OCA, that the Perry 1 buyback represented excess capacity on Penn Power's system, in part because he had held in the base rate case that the 63 Mw retained by the company was not

3. Schedule 3 accompanying Penn Power's ECR filing shows an "Interchanged Receipt" to Cleveland Electric for 26,400 Mwh of Perry 1 power at a cost of $5,014,000 for five months. R. 8a.

excess. Further, he acknowledged that OTS and OCA had not formally disputed Penn Power's claim that its decision to sell the 12 Mw share of Perry 1 capacity to Cleveland Electric was prudent. However, the ALJ said that the dispute over including the buyback costs in Penn Power's ECR "centers on the need for the generation and its price in the context of an adjustable rate for the recovery of the costs of energy. Purely and simply, the incurrence of costs by Penn Power does not result in Penn Power being guaranteed recovery of those costs through its rates." *Id.* at 26. The ALJ noted that Penn Power had made no showing on the record before him that the 12 Mw of Perry 1 capacity would be needed during the eighteen months set by the agreement, nor had the company shown that, even if it were, less expensive power would not be available from other sources.

Consequently, the ALJ recommended that the commission treat the buyback costs according to the alternative method proposed by OCA—allowing the company to recover, through the ECR, the cost of a comparable volume of generation anticipated over the period of the buyback at a system average rate (thus allowing Penn Power to realize a gain to the extent of the difference between the system average cost of energy and the lower energy component of the price of Perry 1 power), but otherwise disallowing costs associated with the buyback (thus charging the full amount of the high capacity component of the price of power from this particular source to Penn Power's shareholders, rather than to its ratepayers).[4]

**4.** The price of any purchase of electric power is made up of an energy component, the variable costs associated with the production of electric energy (primarily the cost of fuel and some operating and maintenance expenses), and a capacity component, costs associated with providing the capability to deliver energy (primarily the capital costs of facilities). The *energy* component of the price of nuclear-generated power is typically quite low—the fuel and operating expenses of such a plant usually are less than those for a conventional facility. The high cost of nuclear-generated power results from the very high *capacity* component of the price for such power, i.e., the portion of the overall cost that relates to the enormous capital costs of building the nuclear facility.

The commission, on consideration of exceptions and replies to exceptions filed by all of the parties in the ECR case, issued an order essentially adopting the recommended decision of the ALJ. The only difference was the commission's direction that the method for calculating the system average rate to be paid to Penn Power not include the Perry 1 rate. The commission's order had the effect of disallowing over $16 million, or approximately 90%, of the costs that Penn Power will incur under the Perry 1 buyback.

Penn Power filed a petition for review with this court, questioning: (1) the disallowance of 90% of the buyback costs, (2) the commission's refusal to be bound by Federal Energy Regulatory Commission approval of Cleveland Electric's wholesale rate, (3) the alleged confiscatory effect of the commission's decision.

 Our scope of review is limited to a determination of whether constitutional rights have been violated, an error of law committed or whether the findings, determinations or order of the commission is supported by substantial evidence in the record. *Pennsylvania Power & Light Co. v. Pennsylvania Public Utility Commission*, 101 Pa.Commonwealth Ct. 370, 516 A.2d 426 (1986).

### Disallowance of Buyback Costs as an Excessive Expense

The PUC operates under a statutory mandate to assure that "[e]very rate made, demanded, or received by any public utility ... shall be just and reasonable...." Section 1301 of the Public Utility Code, 66 Pa. C.S. § 1301. The basic ratemaking formula by which the commission fulfills this duty provides that a utility's revenue requirement (RR) is equal to the amount of proper expenses (E) plus a reasonable rate of return (ROR) on the rate base (RB): RR = E + ROR(RB).

Expenses include such items as the cost of operations and maintenance (labor, fuel and administrative costs, e.g.), depreciation and taxes. In Pennsylvania, fuel and pur-

chased power expenses of electric utilities are recovered primarily through the energy cost rate mechanism, which allows a utility to recover highly variable operating expenses more quickly than it could by waiting to claim them in a future base rate case.

The rate of return is a rate determined by the commission to allow the shareholders the opportunity to earn a reasonable return, or profit, on their rate base investment, in view of the level of risk involved.

The rate base is the value of the property of the utility that is used and useful in providing utility service.

A principle of exclusion from rate base applies when an electric utility builds or otherwise acquires capacity for generating power beyond the projected needs of its customers plus a reasonable reserve margin determined by the commission to be necessary to insure reliability of service. In such a case the amount of such excess capacity will be removed from the rate base.

Short-term purchases of power are not regarded as contributing to the purchasing utility's capacity, but rather as simple purchases of energy. *See generally* J. Cawley and N. Kennard, Rate Case Handbook, A Guide to Utility Rate-making before the Pennsylvania Public Utility Commission 174–257, App. B 1–12 (1983) *and Allegheny Ludlum.*

In the present case, Penn Power argues that, because the commission held that the 12 Mw of capacity represented by the Perry 1 buyback did not result in excess capacity, and because the commission acknowledged that the sale and buyback agreement was prudent when made, no legal basis remains for disallowing any of the costs associated with the purchase.

However, the company's position is simply a reflection of the substantial conceptual and analytic difficulties engendered by the intrusion of *capacity* issues into this ECR proceeding, which was designed for the purpose of allowing expedited recovery of certain *operating expenses.* Simply stated, Penn Power did not choose to claim the purchase of

this 12 Mw of capacity for eighteen months as a temporary addition to its rate base in the concurrent base rate proceeding, and to recover the costs of the purchase of capacity by the normal means, that is, through the expense of depreciation plus the earning of a return on the value of the capacity. Rather, the company has sought to recover all of the costs of the buyback dollar-for-dollar as an *operating expense* in this ECR proceeding.

Although both the ALJ and the commission ruled on the excess capacity question, their ultimate treatment of the buyback costs was consistent with the reality that excess capacity questions and operating expense reasonableness are distinct matters. Because the company claimed the buyback costs as operating expenses, the ALJ and the commission analyzed them as operating expenses. The ALJ stated that the proper evaluation of the costs involved looking at the reasonableness of the purchase at the present time and that the dispute centered on "the need for the generation and its price in the context of an adjustable rate for the recovery of the costs of *energy*." (Emphasis added.)

The contention of OCA that the present case is indistinguishable from the case of *Pennsylvania Power & Light Co. v. Pennsylvania Public Utility Commission*, 101 Pa. Commonwealth Ct. 370, 516 A.2d 426 (1986) (*PP & L*), is incorrect. *PP & L* involved a utility's appeal from an order of the PUC in a general rate case. Among the actions of the PUC that the utility appealed was an excess capacity adjustment disallowing addition to the company's rate base of PP & L's 10% share of two nuclear generators, which the utility had acquired through a sale and temporary buyback similar to the buyback involved in this case. This court affirmed the commission's order, quoting language from the case of *Philadelphia Electric Co. v. Pennsylvania Public Utility Commission*, 61 Pa.Commonwealth Ct. 325, 329, 433 A.2d 620, 623 (1981):

The touchstone for determining whether or not a prudently constructed unit *should be included in a utility's rate*

*base* is whether or not, during the test year involved, the unit will be used and useful in rendering service to the public. (Emphasis added.)

The distinction between *PP & L* and the present case is that in that rate case the utility claimed the disputed capacity as an addition to rate base, and the commission expressly found that the capacity was excess, whereas in this ECR proceeding the company has claimed capacity costs as expenses, and the commission expressly found that the capacity was not excess. Although the facts of the two cases are similar, the legal issues involved are distinct.

OCA argued both before the commission and before this court, apart from its excess capacity contentions, that the Perry 1 buyback represented an unreasonable and excessive expense. One case cited by OCA bears a legal resemblance to the present case. *Duquesne Light Co. v. Pennsylvania Public Utility Commission*, 96 Pa.Commonwealth Ct. 398, 507 A.2d 1274 (1986), also concerned agreements involving Penn Power and CAPCO. In that case, CAPCO had entered into agreements with a mining company for the development of three underground mines in order to secure a long-term source of coal. The PUC instituted an investigation into the reasonableness of the costs that Penn Power and Duquesne Light Company were paying for coal from those mines. OTS entered into a stipulation agreement with the companies setting forth a pricing method that included a price cap formula and an escalator clause recommended by consultants to the companies. The commission ultimately approved the stipulation agreement after substituting price cap and escalator mechanisms recommended by witnesses for OTS during hearings before an ALJ, which resulted in lower allowances for the cost of that coal.

Thus the companies' appeal to this court raised the issue of the commission's power to alter the method for calculating allowable *operating expenses*, which the company claimed through its ECR, in the face of a pre-existing, concededly prudent agreement establishing those expenses. This court first noted that the principle that costs resulting

from managerial imprudence could be denied did not necessarily mean that prudently incurred costs would always be recovered, and we listed examples of utility cases where claimed expenses were disallowed without findings that the utilities had incurred them imprudently. *Duquesne Light,* 96 Pa.Commonwealth Ct. at 404, 507 A.2d at 1278. We then held:

> Prudence on the part of a utility in incurring certain expenses is no guarantee that it will recover those expenses dollar for dollar from its customers. *Utility rates must be just and reasonable when charged, a standard temporally, and therefore often actually quite removed from the prudence of the original arrangements for the products needed to supply the services for which the rates are later charged.*

*Id.,* 96 Pa.Commonwealth Ct. at 405, 507 A.2d at 1278 (emphasis added). As for the binding effect of the agreement in question, we said:

> The Commission never adopted the Stipulation Agreement, as the Companies suggest in their brief. *Just as a utility cannot, by entering into unsupervised agreements with third parties, deprive the Commission of its power to rule on the reasonableness of a utility's rates* (*National Fuel Gas Distribution Corp. v. Pennsylvania Public Utility Commission,* 76 Pa.Commonwealth Ct. 102, 464 A.2d 546 (1983)), it cannot bind the Commission by an agreement entered into with Trial Staff. *Glenside Suburban Radio Cab, Inc. v. Pennsylvania Public Utility Commission,* 49 Pa.Commonwealth Ct. 523, 411 A.2d 874 (1980).

*Id.,* 96 Pa.Commonwealth Ct. at 407, 507 A.2d at 1279 (emphasis added).

The principles for analyzing operating expenses set forth in *Duquesne Light* are equally applicable here. Penn Power's costs for purchased power that are claimed by the company as operating expenses for pass-through to its customers must be reasonable when they are claimed, and the prudence of the original decision to incur those expenses does not control their recovery. Also, Penn Power's entering into an unsupervised contract with Cleveland Electric in

1980 cannot deprive the commission of its power today to determine the reasonableness of expenses claimed under that contract.

Penn Power's decision to enter into that contract was voluntary. The company may have been under *economic* compulsion to sell a 12 Mw share of Perry 1 in 1980 and buy the energy back at a rate to be filed with FERC, but it was under absolutely no *governmental* compulsion to do so, either by FERC or by the PUC; the agreement was completely unsupervised. Under these circumstances, the company (or, more precisely, its shareholders) assumed the risk that expenses resulting from the 1980 agreement might be held by the commission to be unreasonable when the company sought in the future to recover those expenses in rates. The same could be true for a labor contract or a contract for the supplying of coal.

Penn Power contends emphatically that its decision to incur these expenses should be evaluated by comparing these costs to those the company would have incurred had it retained ownership of the 12 Mw in question.[5] However, that argument goes only to the *prudence* of the company's decision in 1980. As we have shown, the prudence of the initial decision to incur particular *expenses* is not determinative of whether those expenses may properly be allowed when they are ultimately claimed in rates.

■ Although the commission's route to its ultimate determination involved an excursion into excess capacity analysis, the commission's ultimate ruling on the Perry 1 buyback costs was based on an analysis of those costs as expenses, which was how the company was claiming them, and a conclusion that those expenses were unreasonable. That conclusion was based on a finding, derived in part from the company's own evidence, that the claimed cost of

5. As OCA points out, the company's claim that the sale and buyback saved its ratepayers some $45 million compared with retained ownership rests on the highly speculative assumption that the PUC would have permitted the company to recover *from ratepayers* all costs associated with the 12 Mw share throughout the life of Perry 1, regardless of other circumstances.

Perry 1 power was roughly ten times that available from other sources. The commission's conclusion was legally correct, and the findings on which it was based are supported by substantial evidence in the record.

### The Filed Rate Doctrine

Penn Power's second argument is that the PUC is preempted from disallowing expenses resulting from the Perry 1 buyback agreement because the rate at which Perry 1 power is sold is a rate filed with the Federal Energy Regulatory Commission, and a state regulatory authority is barred by the "filed rate" doctrine from disallowing expenses incurred as a result of a purchase of power at a FERC-approved rate. For this proposition the company relies primarily on two recent United States Supreme Court decisions, *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 106 S.Ct. 2349, 90 L.Ed.2d 943 (1986) and *Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354, 108 S.Ct. 2428, 101 L.Ed.2d 322 (1988).[6]

In *Nantahala,* two commonly-owned utility companies turned most of the variable power they produced over to the Tennessee Valley Authority, and in return they received jointly from the authority a fixed and reliable supply of low-cost "entitlement power," which they allocated between themselves, with Nantahala receiving 20%. Nantahala also had a contractual right to buy higher cost "purchase power" from the authority. In setting Nantahala's interstate wholesale power rates, FERC decided that the companies' allocation of entitlement power was unfair. FERC allocated 22.5% of the entitlement power to Nantahala and required the company to submit appropriate rates. Later, the North Carolina Utilities Commission (NCUC), in reviewing Nantahala's request to raise its intrastate retail rates, decided that the company should be regarded as receiving 24.5% of the entitlement power, for the purpose of deter-

6. The Supreme Court issued its decision in *Mississippi Power & Light* after the PUC issued its decision in the present case. Although the parties disagree as to the meaning of the Supreme Court's decision, they agree that it is applicable to the determination of this case.

mining the company's costs. That decision was upheld by the North Carolina courts.

On review, the Supreme Court first observed that FERC has exclusive jurisdiction over interstate wholesale power rates pursuant to 16 U.S.C. § 824(b). The Court noted that the "filed rate" doctrine holds in pertinent part that interstate power rates filed with FERC or fixed by FERC must be given binding effect by state utility commissions determining intrastate rates. Tracing the origin of that doctrine to the case of *Montana–Dakota Utilities Co. v. Northwestern Public Service Co.*, 341 U.S. 246, 71 S.Ct. 692, 95 L.Ed. 912 (1951), the Court noted that the doctrine is not a rule of administrative law but rather a matter of enforcing the Supremacy Clause of the Constitution. Further, the Court stated that the doctrine was not limited to rates per se, but was also involved where, as in the case before it, FERC's allocation, of the amount of low-cost power that a utility could obtain, directly affected interstate rates, and FERC had ordered the company to file rates in accordance with that allocation.

The Court observed that NCUC's order calculating Nantahala's costs as if it received more low-cost power than FERC had expressly allocated to it had the same effect as if a state agency refused to allow a middleman faced with a FERC-fixed wholesale price charged by a supplier to recover those costs in its rates. "The fact that NCUC is setting retail rates does not give it license to ignore the limitations that FERC has placed upon Nantahala's available sources of low-cost power." 476 U.S. at 970, 106 S.Ct. at 2539. The Court held that "[FERC's 22.5%] allocation, reflected as it is in a filed rate, must be respected by NCUC. If, as a result, Nantahala needs to purchase additional power from some nonentitlement source, that need is a reasonable one." *Id.* at 972, 106 S.Ct. at 2360.

However, immediately upon announcing this holding, the Court acknowledged a limitation upon it:

Accordingly, the North Carolina Supreme Court erred in relying on cases treating the reasonableness of pur-

chasing from a particular source of, rather than paying a particular rate for, FERC-approved power. See *Pike County Light & Power Co. v. Pennsylvania Public Utility Comm'n*, 77 Pa Commw 268, 273–274, 465 A2d 735, 737–738 (1983); *Kansas–Nebraska Natural Gas Co. v. State Corporation Comm'n*, 4 Kan App 2d 674, 679–680, 610 P2d 121, 127 (1980). Without deciding this issue, we may assume that a particular *quantity* of power procured by a utility from a particular source could be deemed unreasonably excessive if lower-cost power is available elsewhere, even though the higher-cost power actually purchased is obtained at a FERC-approved, and therefore reasonable, *price.*

*Id.* (emphasis in the original).

The Supreme Court's reference to this court's decision in *Pike County Light and Power Co.* was not a disapproval of the holding of that case, but rather a conclusion that the North Carolina Supreme Court erred by applying that holding in inappropriate circumstances. *Pike County Light and Power* involved a claim for recovery of purchased power expenses in a situation where a small Pennsylvania electric retail utility, Pike County Light and Power Company, bought all of the energy it sold at retail from a New York state operating company that was its parent, Orange & Rockland Utilities, Inc. Hence Pike's purchases were in interstate commerce at rates approved for the parent by FERC. This court acknowledged that any attempt by the PUC to regulate the rates in the agreement between the utility and its parent would be pre-empted. However, we emphasized that the section of the Federal Power Act of 1935 that established exclusive federal regulation over matters relating to transmission of electric energy in interstate commerce also expressly reserved some powers for the states: "[S]uch Federal regulation, however, [is] to extend only to those matters which are not subject to regulation by the states." 16 U.S.C. § 824(a).

We found persuasive OCA's argument that the PUC's regulation of the Pennsylvania utility's retail rates did not

involve a state analysis or determination of the reasonableness of the FERC rates:

> The FERC focuses on Orange & Rockland to determine whether it is just and reasonable *for that company to charge* a particular rate, but makes no determination of whether it is just and reasonable *for Pike to incur* such a rate as an expense. The PUC focuses on Pike and its cost of service data to determine whether it is reasonable for Pike to incur such costs in the light of its available alternatives. So while the FERC determines whether it is against the public interest for Orange & Rockland to charge a particular rate in light of its costs, the PUC determines whether it is against the public interest for Pike to pay a particular price in light of its alternatives. The regulatory functions of the FERC and the PUC thus do not overlap, and there is nothing in the federal legislation which preempts the PUC's authority to determine the reasonableness of a utility company's claimed expenses. In fact, we read the Federal Power Act to expressly preserve that important state authority.

*Pike County Light and Power Co. v. Pennsylvania Public Utility Commission,* 77 Pa.Commonwealth Ct. 268, 274–75, 465 A.2d 735, 738 (1983) (emphasis in the original, footnote omitted).

The difference between *Nantahala* and *Pike County Light and Power* is apparent. In *Nantahala* the state commission's refusal to abide by FERC's express allocation of cheap power had the effect of trapping FERC-mandated costs because the utility had no other source of cheap power available to it. In *Pike County Light and Power* the rate at which the utility bought from its parent was set by FERC, but the agreement to purchase at that rate was completely voluntary. *FERC did not mandate the purchase;* hence the PUC was free to consider whether Pike's decision to buy at that FERC-approved rate was justified, in the light of the availability of alternative sources of cheaper power.

■ The circumstances of the present case are analogous to those of *Pike County Light and Power* and are squarely within the limitation recognized by the Supreme Court in *Nantahala.* As was noted in the discussion of the first issue above, Penn Power's decision to enter into the sale and buyback agreement with Cleveland Electric was completely voluntary. Because FERC did not mandate the particular purchase involved in this case, or otherwise limit Penn Power's options for purchasing power, the PUC's decision here is simply a state determination that Penn Power's agreement to purchase the *quantity* of power specified in the 1980 agreement at the FERC-approved rate was unreasonably excessive when lower cost power was readily available elsewhere. The PUC's decision does not constitute an impermissible state determination that FERC-approved rates are not reasonable nor does it result in the trapping of costs that FERC has ordered a utility to incur.

Penn Power attempts to distinguish *Pike County Light and Power* by arguing that that decision rested on a finding that the company's management acted imprudently, and that no such finding has been made here. In fact, the finding of imprudence in that case was a consequence of the finding that the purchased power expense was unreasonably excessive (a determination that necessarily involved comparison to other available sources of cheaper power). We affirmed the PUC's disallowance of a portion of that expense because it was excessive, not because management was imprudent in incurring it.

Penn Power next claims that this case is different because it did not have the luxury of choosing, in 1987, among competing suppliers of energy. This argument in effect merges with the company's third asserted basis for distinction, a claim that the company did not have the legal right to refuse to buy the high-cost Perry 1 power *because of* the 1980 agreement. This argument is circular. Pike County Light and Power was bound by agreements with its out-of-state supplier as well. The issue in that case was whether expenses incurred under those agreements were reasonable,

and hence recoverable in rates, not whether the company had any legal right to refuse to buy that power. Further, Penn Power cannot seriously maintain that *in 1980* it was not aware of sources of purchased power that would be cheaper than that ultimately produced by Perry 1. The company constrained its own choices in 1980 because the buyback was part of the sale of the 12 Mw sale. By the company's own description, the buyback purchase did not result from an objective examination of the market in 1980 for the delivery of power in 1987. The fact that Penn Power voluntarily agreed to the buyback because it wanted to sell the 12 Mw share of Perry 1 cannot be transformed into a finding that the company had no other alternatives.

*Mississippi Power & Light v. Mississippi ex rel. Moore,* 487 U.S. 354, 108 S.Ct. 2428, 101 L.Ed.2d 322 (1988), does not undermine the above analysis in any way. In that case FERC had ordered an allocation among sister operating companies, making up a fully integrated multistate power pool, of the burden of purchasing extremely expensive power produced by a newly completed nuclear generating facility built at the direction of the parent holding company. The Mississippi Supreme Court ruled that the state utility commission had exceeded its authority by permitting a Mississippi member of that system to recover its costs under that allocation as operating expenses, without first conducting an inquiry into whether the company's purchase was prudent. The United States Supreme Court held that the state court's order accomplished the same kind of violation of the Supremacy Clause as was present in *Nantahala. Mississippi Power & Light* again involved a state's purporting to exercise power to evaluate the reasonableness of a utility's purchase, at a FERC-approved rate, pursuant to a FERC-mandated *allocation.* No such federal compulsion for Penn Power to buy back Perry 1 power was present in this case.

### Confiscation

■ Penn Power's final contention is that the PUC' denial of recovery of expenses the company has incurred under

its Perry 1 buyback agreement effects a taking of its property without just compensation, in violation of the Fifth and Fourteenth Amendments to the Constitution of the United States. As OCA points out, Penn Power did not raise this issue before the PUC but rather advances its confiscation argument for the first time on appeal. This issue does not appear among those raised in the company's exceptions to the ALJ's recommended decision or in its reply to exceptions. R. 93a–109a, 128a–133a. Pa.R.A.P. 1551(a) provides in part that no question shall be heard or considered by this court that was not raised before the government unit, except questions involving the validity of a statute or the jurisdiction of the government unit over the subject matter or questions that the court is satisfied the petitioner could not by the exercise of due diligence have raised before the government unit. Because none of the exceptions applies here, we shall not consider this argument.[7]

Accordingly, the order of the Public Utility Commission is affirmed.

## ORDER

NOW, June 16, 1989, the opinion and order of the Pennsylvania Public Utility Commission at Docket Nos. G–870087, G–870088, M–870111 and R–870732, entered May 3, 1988, is affirmed.

---

**7.** Morcover, the confiscation claim has not been successful. Penn Power itself has advanced essentially the same argument previously before this court, the Pennsylvania Supreme Court and the United States Supreme Court, only to have it rejected each time. *See Duquesne Light Co. v. Pennsylvania Public Utility Commission,* 96 Pa. Commonwealth Ct. 398, 507 A.2d 1274 (1986), *and Barasch v. Pennsylvania Public Utility Commission,* 516 Pa. 142, 532 A.2d 325 (1987), *aff'd sub nom. Duquesne Light Co. v. Barasch,* 488 U.S. 299, 109 S.Ct. 609, 102 L.Ed.2d 646 (1989). The same argument also has been rejected when advanced by others. *See, e.g., Pennsylvania Electric Co. v. Pennsylvania Public Utility Commission,* 509 Pa. 324, 502 A.2d 130 (1985), *appeal dismissed sub nom. Metropolitan Edison Co. v. Pennsylvania Public Utility Commission,* 476 U.S. 1137, 106 S.Ct. 2239, 90 L.Ed.2d 687 (1986).