# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Peoples Natural Gas Company, LLC, :
           :
        Petitioner :
           :
     v.      : No. 1024 C.D. 2020
           : Argued: May 13, 2021
Public Utility Commission,   :
           :
        Respondent :


BEFORE:  HONORABLE ANNE E. COVEY, Judge
      HONORABLE MICHAEL H. WOJCIK, Judge
      HONORABLE ELLEN CEISLER, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE WOJCIK        FILED: April 13, 2022


    Peoples Natural Gas Company, LLC (Company) petitions for review of the order of the Pennsylvania Public Utility Commission (PUC), which upheld an Administrative Law Judge's (ALJ) recommended decision to approve the joint petition for partial settlement without modification, and to deny the Company's request to reject audit findings 1, 2, 3, and 5. The issues on appeal in these audit findings involve interest calculations and segregation of certain gas storage costs.[1] After careful review, we affirm.

    The facts and procedural history of this case, as summarized in the PUC's opinion and order dated September 17, 2020, are as follows. Reproduced

---

[1] The Energy Association of Pennsylvania, as *amicus curiae*, also filed a brief seeking to reverse the PUC's decision to approve audit findings 1 and 2.

Record (R.R.) at 525a-626a. The proceeding before the PUC consolidated two separate proceedings for purposes of hearing and recommended decision: the Company's 2020 annual purchased gas cost filing made on April 1, 2020, pursuant to Section 1307(f) of the Public Utility Code (Code), 66 Pa. C.S. §1307(f); and the Company's petition for reconsideration and complaint regarding the PUC's adoption of the Bureau of Audits report dated March 13, 2019. The PUC considered the Company's exceptions, and the PUC Bureau of Investigation and Enforcement's (I&E) replies, to the ALJ's recommended decision issued on July 29, 2020.

The parties reached a settlement on all issues except for audit findings 1, 2, 3, and 5. R.R. at 528a-29a. On June 5, 2020, the Company and I&E[2] informed the ALJ of the partial settlement except for audit findings 1, 2, 3, and 5, and proposed to submit all written testimony and exhibits by stipulation. Therefore, the ALJ cancelled the hearings and issued a recommended decision dated July 29, 2020. *Id.* at 529a-31a. In her recommended decision, the ALJ approved the parties' joint petition for partial settlement and denied the Company's request to reject the PUC audit findings 1, 2, 3, and 5. The Company filed exceptions to the recommended decision and I&E filed replies. *Id.* at 531a-32a.

The audit report reviewed the Company's purchased gas cost rate over-/under-collections for three periods: (1) the 4-month period ended January 31, 2016; (2) the 8-month period ended September 30, 2015; and (3) the 12-month period ended January 31, 2015. These three audit periods occurred after the closing of the acquisition and merger of the former Equitable Gas Company, LLC assets by the Company in December 2013 (Equitable acquisition). Relevant to the Equitable

[2] The Office of Consumer Advocate, the Office of Small Business Advocate, and the Pennsylvania Independent Oil & Gas Association participated in the PUC proceeding with I&E as Joint Petitioners.

acquisition, the PUC approved the parties' agreement that the Company would pay for service by the Allegheny Valley Connector (AVC) portion of Equitrans' interstate pipeline system to store and move gas through the Company's system and to serve priority one (P-1) transportation and non-priority one (NP-1) transportation customers.

During the three audit periods, the Company calculated and applied three main purchased gas cost recovery components through its rider, namely the commodity charge, the capacity charge, and the AVC capacity charge. The audit report explained each charge as follows: the commodity charge was designed to recover the costs of natural gas purchased to serve retail customers; the capacity charge was designed to recover demand and capacity costs excluding demand and capacity costs on the AVC system; and the AVC capacity charge was designed to recover the demand and capacity costs incurred on the AVC system.

On April 26, 2019, the PUC entered an order adopting the six findings in the audit report, noting the Company's disagreement with the findings that interest should be included in the refunds owed to customers, and the finding that the Company's failure to do so might have been unjust and unreasonable. The Company's objections to the audit findings were consolidated with its annual Section 1307(f) proceeding. R.R. at 532a-34a.

The PUC stated that a public utility has the burden of proof to demonstrate by a preponderance of the evidence that a proposed rate is just and reasonable. The evidence produced by a utility in meeting its burden must be substantial. Section 1307(f) of the Code governs recovery of natural gas costs and allows natural gas distribution companies, including the Company, to file tariffs reflecting actual and projected increases and decreases in their natural gas costs, with

3

tariffs being effective six months from the date of filing. Section 1307 of the Code provides that the PUC, after a hearing, shall determine the portion of the Company's natural gas distribution costs in the previous 12-month period that meet the standard set forth in Section 1318(a) of the Code, 66 Pa. C.S. §1318(a). Section 1318(a) of the Code provides that no rates for a natural gas distribution utility, including the Company, shall be deemed just and reasonable unless the PUC finds the utility is pursuing a least-cost fuel procurement policy, consistent with the Company's obligation to provide safe, adequate, and reliable service to its customers. The PUC's policy is to encourage settlements. Whole or partial settlements benefit not only the named parties directly, but all utility customers indirectly. Despite favoring settlements, the PUC does not simply rubber stamp settlements without further inquiry. The petitioners have the burden of proving the settlement is in the public interest. R.R. at 534a-37a. After review, the PUC approved the parties' partial settlement as to audit findings 4 and 6, and conducted further review of the disputed audit findings 1, 2, 3, and 5.[3]

The PUC further noted that the Company was, and is, the proponent of an order authorizing the collection of purchased gas costs recovered from its customers. The audit performed in this case is a statutorily imposed check on the accuracy of the cost recovery per Sections 315 and 1307(f)(2) of the Code, 66 Pa. C.S. §§315 and 1307(f)(2). In this case, the Company had the opportunity to challenge the disputed audit findings and to prove the reasonableness of the rates it charged. R.R. at 563a-67a.

---

[3] The Company also argued that I&E, not the Company, should bear the burden of proof in this proceeding, citing *NRG Energy, Inc. v. Pennsylvania Public Utility Commission*, 233 A.3d 936, 950-51 (Pa. Cmwlth. 2020), *appeal denied*, 244 A.3d 346 (Pa. 2021). The PUC found that the Company had the burden of proof in this proceeding, from which the Company did not appeal. Therefore, the burden of proof issue is not before this Court in this appeal.

4

The ALJ identified three basic issues in dispute regarding audit finding 1: (1) whether the Company should refund ratepayers the sum of $1,497,675, plus additional interest at the applicable rate, through an adjustment to the E-Factor of its next filing; (2) whether the Company should refund interest to compensate for the time between the October 1, 2016 filing and the midpoint of the current reconciliation period in which the corrective adjustment would be included; and (3) whether the Company should have included material adjustments applicable to prior periods in the annual Section 1307(f) filing, rather than being embedded in quarterly rate adjustment filings. The audit concluded that the Company did not include compensation for the use of ratepayer funds within a prior period adjustment calculation as a result of the Company's filing preparation errors. Specifically, during the two annual reconciliation periods ending September 30, 2014, and September 30, 2015, the audit determined the Company made filing errors resulting in an overstatement of Company expenses in the amount of $8,144,121, and an overstatement of Company revenue in the amount of $3,122,637. R.R. at 568a-69a.

After reviewing the position of the Company and I&E, including exceptions and replies, and the ALJ's recommendation, the PUC affirmed the ALJ's ruling on audit finding 1. The PUC noted that audit finding 1 concerns the errors the Company made in presented purchased gas costs and revenues for recovery of such costs during the stated audit periods. There is no dispute that the errors occurred. The only dispute is whether the Company paid the appropriate amount of interest to customers for these errors, and if its use of a quarterly adjustment filing to do so was appropriate. The PUC noted there is no penal aspect to its ruling. Rather, it calls for the Company's diligence and adherence to statutory requirements in its calculation and recovery of gas costs from its customers. R.R. at 586a-87a.

5

The PUC found that the ALJ correctly determined that the Company did not include compensation for the use of ratepayer funds within a prior period adjustment calculation, which resulted in an overstatement of Company revenue and expenses. Although the Company included a prior period adjustment in a filing effective October 1, 2016, the Company failed to include additional interest for the use of ratepayer funds for additional periods, February 1, 2014, through September 30, 2015. The PUC agreed that the burden to calculate and charge reasonable rates falls on the Company. The PUC also agreed that the Company should not benefit from its own multiple and material errors, and it should not be permitted to charge interest to ratepayers on under-collected amounts resulting from the Company's errors. The PUC agreed with the ALJ that the Company should have included $394,351 in interest as recommended by the audit when it calculated annual interest for the periods ended September 2014 and September 2015. The refund sum of $1,497,675 is intended to compensate ratepayers for over-recovery of gas costs in April 2014, July 2014, November 2014, and February 2015. The Company made the mistake and failed to timely capture the error. R.R. at 587a-88a.

The PUC also held that the statutory scheme for gas cost recovery is designed to allow for an orderly review of such cost recovery through a detailed and careful audit process. Quarterly adjustment filings are not subject to the same detailed review, and, therefore, it was not appropriate for the Company to include these proposed adjustments in quarterly adjustment filings. R.R. at 588a-89a.

Audit finding 2 concluded that the Company did not properly reconcile the AVC capacity charge E-Factor balance from inception. AVC capacity costs are charges to the Company for capacity and delivery on the AVC portion of Equitrans' interstate pipeline system. As part of the Equitable acquisition, the Company

6

transferred these assets to Equitable as partial payment. One of the terms of the Equitable acquisition was that these costs be recovered post-transfer the same way the costs were recovered pre-transfer. Therefore, the Equitable acquisition parties agreed that the AVC costs would not be included in other gas recovery costs, and would be assigned to customer classes in the same way that they were recovered under base rates. Per the Company's approved tariff, the AVC capacity charge is calculated and reconciled separately from the traditional capacity charge. The audit determined the Company did not prepare annual reconciliations for the AVC capacity charge, although it tracked the charge monthly including over-/under-collections and on quarterly filings. Based on these findings, the audit recommended that the Company recognize the AVC capacity charge E-Factor balance totaling $4,153,808 as of September 30, 2015, and reconcile, with applicable interest, all subsequent periods as of its next annual filing. R.R. at 589a-90a.

After reviewing the position of the Company and I&E, including exceptions and replies, and the ALJ's recommendation, the PUC affirmed the ALJ's ruling on audit finding 2. The PUC affirmed audit finding 2, which found that the Company's calculation and reconciliation, without interest, of the over-collection amount of the AVC capacity charge for the period between December 2013 and September 2014, and between October 2014 and September 2015, was incorrect. The PUC also found that the Company was responsible for $4,153,808 in AVC capacity charge E-Factor balances, including interest. The PUC specifically reviewed the applicable tariff document, and concluded that it provided helpful background, but was of no consequence to its decision, because the tariff was silent on the issue of interest to be applied to AVC capacity charges.

7

The PUC first decided that AVC capacity costs are "gas costs" and not "capacity costs" as defined under Sections 1307, 1317, and 1318 of the Code. Gas costs are subject to interest per the Code. Then, the PUC found the Company's reliance on the word "may" in Section 1307(f)(1) was misplaced. The PUC opined that this Section provided discretion to the Company to file a tariff reflecting actual and projected gas costs, and to recover these costs under automatic adjustment, but not the ability to elect which gas costs will be recovered under Section 1307(f) annual rate proceedings, and which gas costs would not. The PUC found this action was not retroactive recovery of AVC capacity costs, prohibited by *Cheltenham & Abington Sewerage Company v. Pennsylvania Public Utility Commission*, 25 A.2d 334 (Pa. 1942). The PUC found this adjustment necessary because the Company should have applied interest to the over-/under-collection since inception of the AVC capacity charge, and it did not do so. R.R. at 601a-05a.

Audit finding 3 concluded that the Company mishandled a storage adjustment resulting from a pipeline retainage error. Specifically, the audit determined that the Company overstated gas costs of $1,611,390 for the period between December 2013 and July 2015. Following the Equitable acquisition in 2013, the Company entered into a contract with Equitrans for transmission and gas storage services on the AVC system. The audit determined that Equitrans notified the Company on August 31, 2015, that double-counting of volumes on the AVC system caused too much gas to be retained per the applicable tariff. To correct this error, Equitrans increased the Company's available gas storage, after which the Company made internal adjustments to gas storage records and costs. Based on these findings, the audit recommended that the Company refund $144,186, plus interest at the applicable rate, through an E-Factor adjustment at its next annual

8

filing, and that the Company develop and implement internal controls for preparation and review of its annual filings. R.R. at 606a-09a.

The ALJ explained that although the initial cause of the problem requiring the adjustment was out of the Company's control, the Company did have control over how it handled the adjustment. The way that the Company chose to deal with the adjustment was to net adjustments to gas storage costs together, which decreases transparency and can reduce accurate review of interest calculations, and then the Company used funds that should have been credited to ratepayers without paying interest. After reviewing the position of the Company and I&E, including exceptions and replies, and the ALJ's recommendation, the PUC affirmed the ALJ's ruling on audit finding 3. The PUC affirmed that the Company was not accused of overstating the cost of gas withdrawn or of purchasing additional supply. However, the Company overstated gas costs, and during each month of the error, it was recovering excess retainer charges from customers. Because a portion of the error was relative to a prior period, the Company should have made a prior period adjustment with interest amounting to $144,186. The Company's failure to notice the error caused an overstatement of gas costs, which must be corrected with interest. R.R. at 610a-14a.

Audit finding 5 concluded that the Company improperly booked gas stored for its retail customers with gas stored for its NP-1 storage program. During the Company's annual filing in 2014, the Company proposed to continue releasing storage capacity to NP-1 suppliers by purchasing a predetermined amount of gas to inject into storage in the summer based on nominations from NP-1 suppliers. NP-1 suppliers would then purchase their nominated gas throughout the winter. The Company did not separately record storage activity of retail and NP-1 customers.

9

Instead, the Company used last-in, first-out (LIFO) to value its gas in storage during the audit period. The audit stated the Company should segregate its NP-1 transportation activity from its retail customer storage activity to prevent inaccurate recovery through the Company's rates. The audit further stated when the Company used LIFO without excluding NP-1 activity, it could improperly impact the creation or use of LIFO layers. The ALJ agreed that in order to eliminate the commingling of costs for gas stored for NP-1 and retail customers, the Company must segregate the accounting of purchased gas in storage for these customer classes. If the Company segregated these costs, then the least expensive purchased gas can be segregated for future use by retail customers, in support of a least-cost gas purchasing strategy required by the Code. R.R. at 615a-16a.

After reviewing the position of the Company and I&E, including exceptions and replies, and the ALJ's recommendation, the PUC affirmed the ALJ's ruling on audit finding 5. The PUC found that the Company's internal control to segregate storage gas by customer class is to ensure that there is reduced potential of cross-subsidization of costs and to ensure that the Company is complying with a least-cost gas purchasing strategy. The PUC acknowledged that the NP-1 sales program is not a traditional tariffed storage service, and that the Company maintains ownership of gas until it is sold. However, the PUC found that the Company's NP-1 program remains a sales service and not a storage service. The PUC found that the Company should separate purchases and storage activity for NP-1 customers because the specific volume of gas necessary to meet the needs of the NP-1 sales

10

program is known ahead of time, prior to the start of the storage injection season. R.R. at 622a-24a. The Company then appealed of the PUC's order to this Court.[4]

---

[4] Our standard of review of a PUC order is limited to determining whether a constitutional violation or error in PUC procedure has occurred, the decision is in accordance with the law, and the necessary findings of fact are supported by substantial evidence. *PECO Energy Company v. Pennsylvania Public Utility Commission*, 791 A.2d 1155, 1160 (Pa. 2002). Additionally, this Court has observed:

> We recognize that the [PUC's] "interpretations of the Code . . . and its own regulations are entitled to great deference and should not be reversed unless clearly erroneous." *Energy Conservation Council of Pennsylvania v. Pennsylvania Public Utility Commission*, 995 A.2d 465, 478 (Pa. Cmwlth. 2010) (citing *Popowsky v. Pennsylvania Public Utility Commission*, 706 A.2d 1197, 1203 (Pa. 1997) (*Popowsky I*)). Our Supreme Court has consistently instructed that this Court should not "'substitute its judgment for that of the [PUC] when substantial evidence supports the [PUC's] decision on a matter within the [PUC's] expertise,' nor should it indulge in the process of weighing evidence and resolving conflicting testimony." *Id.* at 478 (quoting *Popowsky I*, 706 A.2d at 1201). Similarly, because the [PUC] is "the administrative body charged with implementing the Competition Act [Electricity Generation Consumer Choice and Competition Act (Competition Act), 65 Pa. C.S. §§2801-2815], [it] is entitled to substantial deference in the performance of its duties, and the [PUC's] interpretation of the Competition Act should not be overturned unless it is clear that such construction is erroneous." *George v. Pennsylvania Public Utility Commission*, 735 A.2d 1282, 1288 (Pa. Cmwlth. 1999). However, when statutory language is unambiguous, we will not give the [PUC] discretion in its interpretation. "'[W]here [the] statutory language is clear, such interpretive discretion ends and the [PUC] must abide by the statute.'" *Dauphin County Industrial Development Authority v. Pennsylvania Public Utility Commission*, 123 A.3d 1124, 1133 (Pa. Cmwlth. 2015) (quoting *Pennsylvania Power Company v. Pennsylvania Public Utility Commission*, 932 A.2d 300, 306 (Pa. Cmwlth. 2007)).

**(Footnote continued on next page…)**

11

On appeal, the Company asserts that the PUC erred as a matter of law, abused its discretion, or its opinion and order lacks substantial evidence when it approved audit findings 1, 2, 3, and 5. We will address each of these claims in turn.

As to audit finding 1, the Company argues that the PUC erred as a matter of law or abused its discretion when it failed to properly calculate interest under audit finding 1. The Company offers the following chart with its positions on each component of the PUC's interest calculation.

| Audit Issue | Amount | Company Position |
|---|---|---|
| Offsetting Interest on PGC [Purchased Gas Cost] Revenue Reductions Against Gas Cost Overstatement | $635,020 | Interest offset for Overstated Revenue is Appropriate |
| Credit for Interest Already Provided to Customers by [the Company] from When The Error Occurred to the Midpoint of the Period when Interest Would Have Been Refunded If There Had Not Been an Error | $394,351 | Provided to customers beginning in the 10/1/2016 Quarterly Filing. |

Nevertheless, when a statutory scheme is technically complex, or "[t]he decision at issue[ ] involve[s] complex financial determinations and weighing and interpreting statistical and economic evidence," the [PUC's] expertise in such matters allows for "broad discretion" in its interpretations and methods. *McCloskey v. Pennsylvania Public Utility Commission*, 225 A.3d 192, 202-03 (Pa. Cmwlth. 2020) (internal quotations omitted); *see also Coalition for Affordable Utility Services & Energy Efficiency in Pennsylvania v. Pennsylvania Public Utility Commission*, 120 A.3d 1087, 1095 (Pa. Cmwlth. 2015).

*NRG Energy, Inc.*, 233 A.3d at 948-49.

12

| Interest Provided to Customers in October 1, 2019 Filing for Remainder of Interest Due to Compensate Customers From When the Error Occurred to the Midpoint (March 2017) of When the Corrections Were Placed in the Quarterly Filing (October 2016) | $468,304 | Provided to customers beginning in the 10/1/2019 Quarterly Filing. |
|---|---|---|
| **Adjustment Proposed by Audits** | **$1,497,675** | |

R.R. at 570a.

The Company agrees that it made errors in gas cost filings that overstated both gas costs and revenues for recovery of gas costs, and that the errors were unintentional. The dispute concerns how to calculate interest on the corrections. The Company contends that the PUC's failure to include interest on under-collections contravenes the express language in Section 1307(f)(5) of the Code, which states:

> (f) Recovery of natural gas costs.--
>
> * * * *
>
> (5) The [PUC], after hearing, shall determine the portion of the company's natural gas distribution actual natural gas costs in the previous 12-month period which meet the standards set out in section 1318. The [PUC] shall, by order, direct each natural gas distribution company subject to this subsection to refund to its customers gas revenues collected pursuant to paragraph (2) which exceed the amount of actual natural gas costs incurred consistent with the standards in section 1318 and to recover from its customers any amount by which the actual natural gas costs, which have been incurred consistent with the standards in section 1318, exceed the revenues collected pursuant to paragraph (2). Absent good reason to the contrary, the [PUC] shall issue its order within six months following the filing of the statement described in paragraph (3). *Refunds to customers shall be made with and recoveries from customers shall include interest at the*

13

*prime rate for commercial borrowing in effect 60 days prior to the tariff filing made under paragraph (1) and as reported in a publicly available source identified by the* [PUC] *or at an interest rate which may be established by the* [PUC] *by regulation.* Nothing under this paragraph shall limit the applicability of a defense, principle or doctrine which would prohibit the [PUC's] inquiry into matters that were decided finally in the [PUC's] order issued under paragraph (2).

66 Pa. C.S. §1307(f)(5) (emphasis added).

The Company asserts that because the conjunctive "and" instead of the disjunctive "or" is used in this section, the PUC must apply interest to both refunds to and recoveries from customers. In the alternative, the Company admits that if the PUC has discretion to determine whether interest should apply to all gas cost components under *Dominion Retail, Inc. v. Pennsylvania Public Utility Commission*, 831 A.2d 810, 814 (Pa. Cmwlth. 2003), the PUC abused its discretion when it applied interest to over-collections but not under-collections.

The Company further argues that it provided $394,351 of interest to customers beginning October 1, 2016. This interest was calculated based on when the Company discovered and corrected the errors. The Company disputes I&E's argument that this interest calculation is unrelated to the over-collection during the overstatement of gas cost errors made, and instead is the interest the Company should have included had it correctly calculated interest for the annual periods ending September 2014 and September 2015.

*Amicus* Energy Association of Pennsylvania (Energy Association) provides background on the calculation of gas costs and the audit process. Energy Association is concerned that the PUC's asymmetrical approach between interest paid to customers and interest collected from customers will have broad and adverse impacts on utility members of the Energy Association. Energy Association argues

14

that the PUC's reasoning that the Company "should not benefit from its own multiple and material errors" is erroneous and unsupported by substantial evidence. R.R. at 587a. Energy Association further argues that the PUC's action is inconsistent with the history and purpose of automatic adjustment clauses, which focus on providing customers with timely information about costs and rates. Energy Association also argues that because the development and administration of purchased gas rate tariffs and mechanisms is complicated, errors can and do occur. Here, Energy Association contends that the Company's errors were computational and unintentional, and therefore the exclusion of interest from under-collections is disproportionate to the nature of the Company's errors. Further, Energy Association argues that the PUC made no finding that the Company's errors were the result of failure to exercise reasonable managerial prudence, and therefore are distinguishable from the factors in *Equitable Gas Company v. Pennsylvania Public Utility Commission*, 526 A.2d 823 (Pa. Cmwlth. 1987).

The PUC responds that it properly adopted audit finding 1, which concluded the Company owed $1,497,675 in interest to its customers due to over-collection of gas costs resulting from multiple errors made by the Company. The PUC responds that the Company is not entitled to offset interest that it claims was already paid to its customers, because this interest was for issues or time frames other than those associated with this audit. Specifically, for the two annual periods ending September 2014 and September 2015, the audit determined that the Company made several filing preparation errors resulting in an overstatement of expenses totaling $8,144,121 refunded to ratepayers, and an overstatement of revenues totaling $3,122,637 recovered from ratepayers. As such, the audit calculated that the Company must pay $1,497,675 in interest to its customers due to the improper

15

use of customer funds through over-collection. That amount should have been included with the Company's October 1, 2016 E-Factor adjustment, but it was not.

The PUC further responds to the Company's assertion that Section 1307(f)(5) of the Code requires interest for over-collections and under-collections. The PUC argues that audit finding 1 concerns errors the Company made in presenting costs and revenues, whether the Company paid the appropriate amount of interest, and whether its use of quarterly adjustment filings to do so was appropriate. The PUC argues that it is the Company's duty to adhere to statutory requirements, and to calculate and recover reasonable gas costs from its customers, citing *Pennsylvania Power Company v. Pennsylvania Public Utility Commission*, 561 A.2d 43 (Pa. Cmwlth. 1989). The PUC argues that substantial evidence supports the audit's finding that the Company failed to include additional interest for the period of February 1, 2014, through September 30, 2015, which is what the proposed interest charge is intended to address.

The PUC then addresses the three components that make up the $1,497,675 and explains why the Company should not be entitled to offset each component. The PUC asserts that the Company is not entitled to offset total interest by $635,020 for interest the Company claims it is owed from customers for under-collection. Although Section 1307(f)(5) of the Code allows for interest when recovery of under-collections is necessary as part of the normal reconciliation process, the Company should not be permitted to benefit by collecting interest from ratepayers caused by calculation errors made by the Company. The PUC cites the testimony of the PUC's lead auditor, who testified that it would be unethical for a utility to benefit from self-inflicted errors, when the motivation behind Section 1307(f)(5) is to fairly compensate parties for unforeseen changes but not for the

16

utility's erroneous calculations. R.R. at 198a-99a. The PUC further responds that the Company has the burden to calculate and charge reasonable rates, as it, and not the customer, has the data to calculate reasonable rates. It was incumbent on the Company to use accurate data, and it failed to exercise proper care in this calculation.

The PUC next addresses the Company's claim that $394,351 should be used to offset the total interest owed. The PUC states that the $394,351 represents the correction to the interest that the Company miscalculated for the annual periods ending September 2014, and September 2015. The PUC asserts that the Company made the mistake in its calculations, failed to capture the error in a timely manner, and only began its refund to ratepayers beginning in October 2016. The PUC also responds to the Company's argument it is entitled to a credit for $468,304 in interest the Company already paid. The PUC cites the testimony of the PUC's lead auditor that it would be reasonable for the Company to take credit for this amount it claims to have already included in its rate adjustment effective October 1, 2016, subject to review at the next financial audit to verify completion. R.R. at 244a-45a. The PUC argues that the Company's failure to include interest on refunds to customers was unjust and unreasonable. Therefore, the PUC argues that requiring the Company to apply interest is in the public interest, citing Sections 1307(d) and 1312(a) of the Code, 66 Pa. C.S §§1307(d), 1312(a). The PUC contends that this audit position is not new. The PUC further contends that the Company's attempt to include these major corrective adjustments in its quarterly filings is improper, can result in confusion and an undetected over-recovery of gas costs from customers for extended periods. The PUC further argues the Company is not entitled to an offset for interest the Company claims its customers owe for under-collection, because such interest would unjustly allow the Company to benefit from its own errors.

17

As to audit finding 2, the Company argues that the PUC erred as a matter of law when it adopted audit finding 2, and concluded, contrary to the Company's approved tariff, that it should be required to retroactively pay interest on over-and under-collections of AVC costs. The Company summarized the history of the AVC charge, which resulted from the Equitable acquisition in 2013. The parties to the Equitable acquisition agreed to a number of special ratemaking conventions applicable to AVC assets, including that these costs be recovered through a separate charge that would be reconciled without interest. The Company points to certain defined terms in the approved tariff, the "DOU" and the "AVCOU,"[5] especially to a footnote that clearly delineates that interest be applied only to DOU demand or capacity over-/under-collections, which excludes AVC charges. The Company argues that the AVC capacity charge is a different charge that is not part of the DOU. As such, it is included in the definition of AVCOU, which does not specifically reference interest. The Company also argues that no interest is owed because the parties failed to raise interest on AVC charges in six prior annual filing proceedings since the Equitable acquisition in 2013. The Company further argues that the PUC unlawfully ordered the retroactive application of interest on AVC capacity charges. The Company argues that the PUC unlawfully revised the Company's tariff to allow interest on AVC capacity charges, which were excluded from interest in the tariff. The Company argues utility tariffs have the force and effect of law binding on all parties, citing *Cheltenham & Abington Sewerage Company*, 25 A.2d at 336-39.

---

[5] In the tariff, "DOU" is defined as experienced net over-collection or under-collection of demand or capacity cost (excluding the AVC capacity charges) or purchased gas. Footnote 1 to the DOU definition provides that interest will be applied in accordance with applicable law. "AVCOU" is defined as experienced net over-collection or under-collection of AVC capacity costs, and there is no footnote delineating interest on AVCOU costs. *See* R.R. at 285a-86a, 596a-97a.

18

*Amicus* Energy Association also argues the PUC unlawfully ignored the plain language of the tariff when it imposed interest on AVC capacity charges. Energy Association provided background on the use of tariffs, and argued that it is well established that tariffs have the force and effect of law, citing *Brockway Glass v. Pennsylvania Public Utility Commission*, 437 A.2d 1067 (Pa. Cmwlth. 1982). Energy Association disagrees with the PUC finding that AVC capacity charge was a gas cost, and, as such, over-collections received from ratepayers must be reconciled with interest under Section 1307(f) of the Code. Energy Association argues that in doing so, the PUC ignored the plain language of the tariff. Energy Association also disagrees with the PUC finding that the tariff was useful for background information but was of no consequence in the current proceeding. Energy Association argues that the tariff helps provide a nuanced understanding of the AVC capacity charge and how it should be treated.

The PUC responds that its decision to adopt audit finding 2 was in accordance with the law and supported by substantial evidence. The PUC summarizes how the AVC capacity charge originated with the Equitable acquisition. The PUC agrees that the Equitable parties agreed that the AVC capacity charges would not be included with traditional capacity charges, as indicated in the tariff. However, the PUC argues that because the charge is ultimately subject to review as a gas cost under Section 1307(f)(5), it must include interest. The PUC points to the testimony of its lead auditor, who stated that the Company's reconciliation was flawed because it did not include these charges in its annual reconciliations, but tracked them monthly, and included the charges on its quarterly reconciliations. The audit found that the Company owed $4,153,808 in interest as of September 2015. The PUC relies on Sections 1307, 1317 and 1318 of the Code to support its position

19

that AVC capacity charges are gas costs under the Code. Capacity costs are typically included in gas costs for recovery under Section 1307(f) of the Code, because capacity costs are a category of direct costs the Company pays for the purchase and delivery of natural gas to its customers. The Company acknowledges that the AVC capacity costs are capacity costs, therefore the PUC found that they are clearly gas costs. The fact that the tariff permits the AVC capacity charge to be calculated and reconciled differently does not change the nature of these costs. As a gas cost, the AVC capacity charge is subject to Section 1307(f) of the Code, which requires interest to be applied.

The PUC agrees with the Company that the PUC has discretion to determine which charges will be considered gas costs, which is what it did in this proceeding. The PUC argues that the Company's reliance on *Dominion Retail, Inc.*, 831 A.2d at 814, and *National Fuel Gas Distribution Corporation v. Pennsylvania Public Utility Commission*, 587 A.2d 54, 61-62 (Pa. Cmwlth. 1991), is misplaced. In these cases, the Court upheld the PUC's analysis that certain costs were not gas costs, and, thus, were not subject to reconciliation and interest under Section 1307(f)(5) of the Code. The PUC argues that because the AVC capacity charge is a gas cost subject to reconciliation and interest under Section 1307(f)(5), the language of the tariff is irrelevant. Alternatively, the PUC argues the tariff itself does not expressly include or exclude interest in AVC capacity charges. The PUC argues that the tariff's silence on the issue is not sufficient to demonstrate the AVC capacity charge should exclude interest, especially when such interest is required by statute. The PUC also contends that the inclusion of this interest is not impermissible retroactive application. As found in the audit, the Company's failure to include interest to the over-/under-collection on AVC capacity charges dates back to its

20

inception. This finding corrects the Company's mistake back to when the Company began making it.

As to audit finding 3, the Company argues that the PUC abused its discretion when it adopted audit finding 3 and found that the Company must pay $144,186, plus applicable interest, to customers due to an error made by Equitrans, not the Company. The Company summarizes audit finding 3 as related to a refund made by Equitrans to the Company for double-charging retainage for gas transported by the Company on Equitrans facilities. Because the Company must pay for retained gas, its cost is recovered in charges to customers. Equitrans double-charged the Company for 20 months. When it discovered the error, Equitrans corrected it by reducing an adjustment it was also making for storage losses. On receiving the adjusted balance, the Company reduced its gas costs when it received the offset from Equitrans.

The Company objects to the PUC's finding that it should go back to each month a retainage error was charged to the Company and recalculate the interest owed on over-/under-collections. The Company rejects the PUC's finding that it failed to notice Equitrans' error and therefore must pay interest when the errors occurred, because the Company did not have use of any customer funds related to the error during the error period. The Company argues that this finding unfairly punishes the Company for the error of a third party. In addition, the Company reduced customer costs immediately upon receipt of the correction.

The PUC responds that it properly adopted audit finding 3 due to the Company's failure to detect and properly adjust for Equitrans' errors. Specifically, the Company overstated gas costs of $1,611,390 over the 20-month period from December 2013 to July 2015. On August 31, 2015, Equitrans notified the Company

that double-counting of volumes on both the AVC transmission system and the AVC storage system caused too much gas to be retained per Equitrans' tariff. To correct this error, Equitrans increased the Company's available gas storage, and the Company made internal adjusting entries to its gas in storage and reported gas costs. The audit found reported gas costs were handled incorrectly. The first adjustment was a netted adjustment that included a refund to ratepayers of $1,272,989 and a recovery of $664,755, resulting in a reduction of gas costs in August 2015 of $608,234. The second adjustment was a refund to ratepayers of $338,393 to correct pipeline retainer errors for the remaining seven-month period from January 2015 to July 2015. The Company included the full refund to ratepayers of $1,611,390 to correct for the 20-month retainage error within the 2-month period of July 2015 to September 2015, which falls within the 12-month reconciliation period of October 2014 to September 2015. The Company's full refund was incorrect because the portion of the total retainage error for the 10-month period between December 2013 to September 2014 should have been an adjustment to a prior period.

The PUC argues that at the time it made the adjustment, the Company had the opportunity to correct the monthly activity within the current reconciliation period from October 2014 to September 2015, prior to applying interest to the over-/under-collection. Upon receiving the net adjustment from Equitrans, the Company reduced its gas costs charged to customers in an effort to reflect the correction of the retainage errors previously charged to customers. The PUC argues, however, that the Company must go back to each month in which the retainage error was charged to customers, restate the gas costs, and recalculate over-/under-collections and interest. Accordingly, the PUC asserts the Company must pay its customers additional interest of $144,186.

22

The PUC responds to the Company's argument that it should not be punished for Equitrans' error, and that the Company did not have use of customer funds triggering interest. The PUC affirms that it did not accuse the Company of overstating the cost of gas withdrawn or of purchasing additional supply. Instead, gas costs were overstated because in each of the twenty months during the error, excess retainage charges were being recovered from customers. Therefore, adjustments to the prior period from December 2013 to September 2014, including appropriate interest, should have been made, but were not. The PUC rejected the Company's method of making adjustments, which was to net the adjustments together, which decreased transparency and potentially reduced the accuracy of interest calculations. The Company then used funds that should have been credited to ratepayers without paying interest on those funds. The PUC asserts that the Company's failure to notice and fix the error in a timely manner caused a monthly overstatement of gas costs, which must be corrected with interest.

As to audit finding 5, the Company argues that the PUC erred as a matter of law when it adopted audit finding 5 and concluded, contrary to the approved tariff, that the Company should develop accounting procedures to account for NP-1 transportation gas separately from sales gas, and to make a refund to sales customers based on a retroactive adjustment. The Company pointed to its tariff under which its tariffed sales program for NP-1 suppliers requires the Company to purchase gas at a certain time of the year and then sell it to NP-1 suppliers at a price set forth in the tariff. The costs and revenues for this service are included in the Company's Section 1307(f) reconciliation. As part of this reconciliation, the audit recommended that the Company segregate gas purchased for NP-1 suppliers from gas purchased for sales customers. The audit found that the least-cost purchased gas

23

should be segregated for sales customers under Section 1307(f) reconciliation, and that costs for purchased gas for NP-1 customers should not be included for recovery in Section 1307(f) rates. The audit recommended that the Company go back and separately calculate any effect on retail sales gas pricing if the NP-1 gas was segregated, and determine whether a refund and interest should be provided to Section 1307(f) sales customers.

The Company argues that the PUC erred when it issued this directive because the tariff provides no basis to segregate the lowest cost gas for Section 1307(f) sales customers or for awarding refunds with interest. The Company points out that no parties alleged that the Company failed to follow the express terms of its tariff. The Company argues that the adoption of audit finding 5 retroactively revises the terms of the NP-1 tariff program, and, thus, is an error of law.

The PUC responds that its adoption of audit finding 5 was appropriate to ensure least-cost gas procurement required by the Code. The PUC provides background on the Company's 2010 base rate case, where the Company released storage capacity to NP-1 suppliers through its tariff. After the Equitable acquisition in 2013, the Company no longer owned the storage services that it used to offer this service. During the Company's Section 1307(f) proceeding in 2014, the Company proposed to offer this benefit to NP-1 suppliers, but in a different manner. Under the new program, the Company purchased a predetermined amount of gas to inject into storage in the summer months based on nomination forms from NP-1 suppliers. NP-1 suppliers were then obligated to purchase the nominated gas through the winter withdrawal season. The PUC recommended that the Company segregate its NP-1 transportation storage activity from the retail sales customers' storage activity for accounting purposes, and to prevent inaccurate recovery through its rates. The

24

Company was using LIFO to value its gas in storage during this audit period. The PUC contends that when the Company used LIFO to value the gas in storage without excluding NP-1 storage activity first, it could improperly impact the creation or use of LIFO layers. The PUC recommended segregation of the gas storage costs for these two different classes of customers, after which the Company should calculate the effect on retail gas storage pricing, and any refund owed should include interest.

The PUC also responds to the Company's argument that such segregation is not included in its tariff, and that the segregation of gas costs will require the terms of the tariff to be changed. The PUC denies that segregation will cause the terms of the tariff to be changed and notes that the PUC did not conclude that the Company was in violation of its tariff. The PUC explains the purpose of this change to internal control is to ensure that there is reduced potential for cross-subsidization of costs or possible inflation of the average cost of purchased gas. Segregation of costs is necessary to ensure that storage costs associated with NP-1 sales are not inadvertently recovered through the Company's regular rates, and also to ensure that the Company is complying with a least-cost gas purchasing strategy. Specifically, if the inclusion of gas purchased to store for the NP-1 program created a higher LIFO layer, which would then be used for sales customers, that could inappropriately increase costs for ratepayers. The PUC further responds that audit finding 5 is not an impermissible retroactive adjustment to the Company's tariff. The PUC contends that during an audit, if potential for cross-subsidization of costs or possible inflation of average gas costs is discovered, the PUC can properly request the Company to look back over the audit period to determine whether these things occurred.

With the applicable standard of review in mind, which requires this Court to give "great deference" to the PUC's interpretation of the Code regulations, we will overturn the PUC's interpretation only if it is "clearly erroneous." *NRG Energy, Inc.*, 233 A.3d at 948-49. After careful review of audit findings 1, 2, 3, and 5, we discern no error in the PUC's interpretation of Sections 1307 and 1318 of the Code as applied to these audit findings. The adjustments made under the Section 1307 reconciliation process are subject to review under Section 1318, by the plain language of Section 1307(f)(5), so that the PUC may determine whether those adjustments are "just and reasonable" for ratepayers.

As our Court explained in *Dominion Retail, Inc.*, 831 A.2d at 813, "Section 1307(f) [of the Code] provides for the automatic adjustment of rates associated with natural gas costs incurred." After approval of the utility's estimate in its Section 1307(f) adjustment, the PUC performs an annual "audit of the experienced costs compared to the amount collected over the past 12 months." *Id.* This annual audit "permits experienced over- or under-collections attributable to the automatic rate adjustment mechanism to be reconciled by the utility and its customers." *Id.* at 813-14. Our Court further explained that through the Section 1307(f) reconciliation process "the PUC insures that a utility is made whole while protecting the ratepayer from overcharges resulting from the inaccuracies of the utility's estimates." *Id.* at 814. We recognized that the PUC "is afforded broad discretion in determining which costs are natural gas costs for purposes of recovery under Section 1307(f)." *Id.* We have held that a utility has no basis for appellate relief because the PUC did not accept the utility's excuses for its accounting decisions. *Equitable Gas Company*, 526 A.2d at 828. We may not substitute our judgment for the PUC's or reweigh evidence. *Id.*

As to audit finding 1, the PUC did not err in requiring the Company to refund $1,497,675, plus applicable interest, through an adjustment to the E-factor at the Company's next filing, when the adjustment was necessitated by the Company's admitted filing errors. We agree with the PUC that this adjustment is not punitive, but is meant to make the Company accountable for accurate filings to ensure just and reasonable rates under Section 1318 of the Code. We further find no errors in the additional adjustments ordered by the PUC in audit finding 1.

As to audit finding 2, the PUC did not err in requiring the Company to adjust its AVC capacity charge, plus applicable interest, which was caused by the Company's failure to reconcile its AVC capacity charge annually, as required by its tariff. The PUC did not err when it determined the AVC capacity charge was subject to adjustment as a gas cost, as defined by Sections 1307, 1317, and 1318 of the Code, and, thus, subject to interest.

As to audit finding 3, the PUC did not err in requiring the Company to adjust its gas costs of $1,611,390 for the period between December 2013 and July 2015, thus requiring the Company to pay interest in the amount of $144,186. Although the gas retainage cost adjustment was initially caused by a third party, Equitrans, the Company failed to properly account for these charges.

As to audit finding 5, the PUC did not err in requiring the Company to properly account for gas sales in its NP-1 program, to ensure that NP-1 customers received reasonable and just rates under the Company's "least[-]cost fuel procurement policy" as required by Section 1318(a) of the Code.

For all these reasons, we affirm the PUC's order.


_____
MICHAEL H. WOJCIK, Judge


Judge Fizzano Cannon did not participate in the decision of this case.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Peoples Natural Gas Company, LLC,   :
                                                :
                    Petitioner   :
                                                  :
                v.                    : No. 1024 C.D. 2020
                                                :
Public Utility Commission,         :
                                                :
                Respondent   :

## **O R D E R**

AND NOW, this 13th day of April, 2022, the order of the Pennsylvania Public Utility Commission dated September 17, 2020, is AFFIRMED.

_____
MICHAEL H. WOJCIK, Judge